**MONROE GUARANTY INSURANCE COMPANY, Appellant–Defendant,**

v.

**MAGWERKS CORPORATION, Appellee–Plaintiff.**

No. 49A02–0208–CV–622.

Court of Appeals of Indiana.

Sept. 24, 2003.

Todd J. Kaiser, Matthew S. Effland, Ogletree Deakins Law Firm, Indianapolis, IN, Attorneys for Appellant.

William E. Winingham, Wilson Kehoe & Winingham, FRank D. Otte, Indianapolis, IN, Attorneys for Appellee.

Steve Carter, Attorney General of Indiana, Scott A. Kreider, Deputy Attorney General, Indianapolis, IN, Attorneys for Intervenor the State of Indiana.

## OPINION

BAKER, Judge.

Today we are called upon to resolve an issue of first impression in Indiana: Was it proper for the trial court to have determined, in its interpretation of an insurance policy as a matter of law, that a "collapse" of a building occurred? We think not in this case and reverse.

Appellant-defendant Monroe Guaranty Insurance Company (Monroe Guaranty) appeals the entry of summary judgment in favor of appellee-plaintiff, the Magwerks Corporation (Magwerks), claiming that the trial court erroneously determined, as a matter of law, that there was a "collapse" of Magwerks's commercial building, thereby subjecting Monroe Guaranty to pay the damage claim pursuant to the insurance policy issued to Magwerks. Monroe Guaranty also challenges the compensatory and punitive damage awards entered for Magwerks regarding the alleged bad faith handling of the claim. Concluding that a genuine issue of material fact existed as to whether Magwerks's building "collapsed" in accordance with the definition set forth in the policy, we reverse the entry of summary judgment, vacate the damage award, and remand this cause for further proceedings consistent with this opinion.

## FACTS

Magwerks is an Indianapolis company that sells manufactured camshafts from its one-story, flat-roofed building. The roof was constructed of tar and asphalt, with 4' × 8' ceiling sections, and there was no separate ceiling suspended. Inasmuch as Magwerks's building housed stock and equipment valued at nearly $2 million, it contracted with Monroe Guaranty in June 1995 for insurance on the building and its personal property. The policy was effective through June 1997, and Magwerks had fully paid the premiums on the $1.25 million policy.

Sometime in February 1997, heavy rains and some snow had accumulated and resulted in damage to Magwerks's roof. At one point, a 4' × 8' section of the ceiling crashed to the floor. In response, Magwerks used plywood to cover the hole in the roof, and the company began using metal drums to catch the leaking water. Magwerks personnel also ran hoses to a floor drain and tarps were used to protect the company's equipment. Eventually, more roof panels collapsed under their own weight. As a consequence, water seeped through the holes, causing adjacent 4' × 8' roof panels to soak up water. These panels eventually broke and fell through to the floor. As a consequence, some of Magwerks's equipment was damaged and the humidity eventually rusted the grinders and steel camshafts.

Patrick Jenkins, the president of Magwerks, reported the damages to its insurance agent. Jenkins indicated, however, that he was going to attempt to conduct his own repairs and informed the agent that he did not require any assistance from Monroe Guaranty at that point. However, in May 1997, Jenkins again contacted the agent, whereupon a property loss notice was submitted to Monroe Guaranty describing the loss as follows: "Continuous rain has caused damage to roof, actuall [sic] has collapsed in several areas." Appellant's App. p. 85. The claim was then submitted to Paul Kelter, an adjuster with Monroe Guaranty.

Kelter visited Magwerks and conducted his own inspection of the premises. He walked on the roof and observed that it had not lost its support. Kelter further observed that the structural framing remained intact and did not give way. Kelter did not believe that he was in any danger and considered the roof "firm and

secure." Appellant's App. p. 183. Also, while there were some patches with minor repairs on the north end of the roof, Kelter did not notice any damage on the south side.

Kelter then contacted Tim Moehl of McComas Engineering to perform an inspection of the roof and determine the cause of the damage. Moehl ultimately determined that a number of roof leaks had occurred over a long period of time. Based upon his review and inspection, it was his opinion:

> That the cause of the damage to the roof is long-term infiltration of rain water through the roof covering, into the underlying structure. The building was constructed with inadequate roof slope to properly relieve rain water from the structure. Although the roof was maintained annually, the lack of slope has caused rain water to pond on the roof covering. The long-term ponding conditions eventually affected the structural integrity of the roof deck. Rain water infiltrates the underlying structure when it is allowed to pond.

Appellant's App. p. 88.

By June 26, 1997, Jenkins reported to his insurance agent that the building had lost more roof panels and that there was continued deterioration of non-structural materials, inventory and machinery. Jenkins also informed his agent that he was "looking at temporary facilities to keep production going." Appellant's App. p. 147.

Monroe Guaranty received Moehl's engineering report on July 15, 1997. Kelter wrote in his log notes that Moehl believed that the defective design of the building prevented proper drainage and standing water was causing the damage to the roof and inside leakage. Three days later, Kelter reviewed these findings with his supervisor and determined there were policy provisions that excluded coverage for Magwerks's claim.

Monroe Guaranty initially did not respond to Jenkins's telephone calls regarding the roof. Thus, Magwerks retained several contractors to supply estimates for the necessary repairs. Wuelfing Construction Company referred to the damage as "broken and collapsed roof panels." Appellee's Supp.App. at 167.

On July 17, 1997, Jenkins sent his insurance agent two quotes regarding the roof repair and requested Monroe Guaranty's position on the matter. Monroe Guaranty ultimately denied the claim. In so doing, Magwerks's local insurance agent referred to Moehl's report indicating that the roof's inadequate slope had permitted the ponding of water that caused the sections of the roof to collapse along with Moehl's recommendation that a new metal deck should be installed. In essence, it was Monroe Guaranty's position that the loss was excluded because of wear and tear to the roof, decay, deterioration and defective design. Moreover, Monroe Guaranty determined that the damage did not satisfy the definition of a "collapse" because the structural framing of the roof remained intact and was still functioning. Appellant's App. p. 181. Kelter believed that the long-term process of the water standing on the roof caused the roof deck to deteriorate and he did not believe that the weight of the rain caused the damage. Therefore, Monroe Guaranty determined that Magwerks's losses were excluded under the policy.

In August 1997, Magwerks filed a complaint for breach of contract, claiming that Monroe Guaranty "breached its duties and obligations ... by refusing to provide coverage for the repair of Magwerks's principal place of business and the repair and/or replacement of Magwerks' business personal property." Appellant's App. p. 18.

Magwerks also included a count charging Monroe Guaranty with lack of good faith and fair dealing because it unreasonably relied upon ambiguous language in the insurance policy regarding the definition of "collapse" as well as the alleged defective condition of the roof of the building in denying the claim. Thus, Magwerks requested an award of punitive damages.

Both parties eventually moved for summary judgment. Magwerks argued in its motion that the sudden falling in of the internal ceiling tiles, coupled with the continued deterioration of the roof, constituted a "collapse" under the terms of the policy and, therefore, that it was entitled to judgment as a matter of law. In contrast, Monroe Guaranty argued that under the traditional definition of the term "collapse," more was required, such as a complete falling in of the roof and an inability to conduct business. Monroe Guaranty also claimed that even if the damage constituted "collapse" it was simply not covered under the policy. In the end, the trial court determined as a matter of law that Monroe Guaranty had breached its contract because the damage constituted a "collapse" under the policy. Thus, Magwerks's motion for summary judgment was granted and the cause proceeded to trial on the issues of damages and bad faith.

In the end, the jury found for Magwerks and determined that Monroe Guaranty acted in bad faith by failing to explain to Magwerks why coverage was denied. The jury ultimately returned a verdict for Magwerks and awarded it $5.1 million—$4 million of which constituted punitive damages for Monroe Guaranty's bad faith handling of the claim.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a decision upon a summary judgment motion, we apply the same standard as the trial court. *Myers v. Irving Materials, Inc.*, 780 N.E.2d 1226, 1228 (Ind.App.2003). We do not reweigh the evidence designated by the parties. *Turley v. Hyten*, 751 N.E.2d 249, 251 (Ind. Ct.App.2001). Instead, we liberally construe the evidence in the light most favorable to the non-moving party. *Schoknecht v. Hasemeier*, 735 N.E.2d 299, 301 (Ind.Ct. App.2000).

The moving party bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Id.* Once this burden has been met, the non-moving party must respond by setting forth specific facts demonstrating a genuine need for trial, and cannot rest upon the allegations or denials in the pleadings. *Id.* We review only the designated evidentiary material in the record, construing that evidence liberally in favor of the non-moving party, so as not to deny that party its day in court. *Id.*

### II. Monroe Guaranty's Claims

Monroe Guaranty argues that summary judgment was erroneously entered for Magwerks and the verdict cannot stand because the damage to the building could not be deemed a "collapse" under the provisions of the insurance policy. Specifically, Monroe Guaranty contends that only a limited portion of the roof was damaged and there could not have been a collapse as a matter of law. Thus, reasons Monroe Guaranty, summary judgment should have been granted in its favor.

In addressing Monroe Guaranty's claims, we first set forth some general legal principles when construing contract terms. Contracts of insurance are

subject to the same rules of construction as are other contracts. *Ramirez v. Am. Family Mut. Ins. Co.,* 652 N.E.2d 511, 514 (Ind.Ct.App.1995). Summary judgment based upon an insurance contract is a legal determination that the agreement is unambiguous and that the rules of contract construction need not be employed to ascertain the contract's meaning. *Id.* An unambiguous insurance policy must be enforced according to its terms, even those terms that limit an insurer's liability. *Id.* However, an insurance contract will be deemed ambiguous in the event that reasonable people upon reading the contract would differ as to the meaning of its terms. *Id.*

 Like other agreements, insurance contracts must be construed as a whole. *Pennington v. Am. Family Ins. Group,* 626 N.E.2d 461, 464 (Ind.Ct.App. 1993). Construction of the contract as a whole requires reading beyond isolated phrases, and unclear terms can be clarified by reading the entire contract. *Id.* However, where a policy contains inconsistent and contradictory provisions, the provision most favorable to the insured will be adopted. *Great Lakes Chem. Corp. v. Int'l Surplus Lines Ins. Co.,* 638 N.E.2d 847, 852 (Ind.Ct.App.1994).

 We also note that ambiguous provisions are to be construed in favor of the insured, particularly provisions that limit or exclude coverage. *Assoc. Aviation Underwriters v. George Koch Sons,* 712 N.E.2d 1071, 1076 (Ind.Ct.App.1999). Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorable to the insured to further the policy's basic purpose of indemnity. *Id.* This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the customer. *Id.*

Turning to the relevant provisions of the Monroe Guaranty policy issued to Magwerks, the subsection entitled "Causes of Loss—Special Form," provides for the following exclusions:

(2)(d)(1) Wear and tear;

(2) Decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

. . . .

(4) Settling, cracking, shrinking or expansion;

. . . .

(f) Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

. . . .

(k) Collapse, except as provided below in the Additional Coverage for Collapse. But if loss or damage by a Covered Collapse of Loss results at the described premises, we will pay for that resulting loss or damage.

(3)(c) Faulty, inadequate or defective

(2) workmanship, repair, construction. . . .

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance

Appellant's App. p. 51–52. After excluding coverage for "collapse," the policy effectively "adds back" such coverage if certain causes of loss exist that are set forth in the "ADDITIONAL COVERAGE—COLLAPSE" section of the policy:

We will pay for direct physical loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

2. Hidden decay;

3. Hidden insect or vermin damage;

4. Weight of people or personal property;

5. Weight of rain that collects on a roof;

6. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

Appellant's App. p. 53.

 While it is apparent that the above language provides for "collapse" coverage in some circumstances, that term is not defined. Instead, the policy merely lists those instances that do not amount to a collapse. Thus, the crux of the problem here necessarily involves the definition of this term under the policy.

Inasmuch as our courts have not yet been called upon to construe this term, Monroe Guaranty urges that we follow what it deems a "traditional" definition of collapse. Specifically, Monroe Guaranty asserts that "collapse" should be limited to an event that occurs suddenly and results in complete disintegration. *See Dominick v. Statesman Ins. Co.*, 692 A.2d 188, 191–92 (Pa.Sup.Ct.1997). This definition typically allows for no coverage under an insurance policy when only "part of a part" of a building falls:

> The language 'or any part thereof' [in an insurance policy] obviously refers to 'collapse' of a part of a building, not 'partial collapse'; of a part or the whole of a building. The falling or reduction to a flattened form or rubble of an attached garage, supporting foundation wall or roof would appear to be but a few examples of collapse of a part of a building.... Where the claim pertains to a

collapse of a part of a building, there must be a collapse of that part. A partial collapse of a part is entirely outside the contemplation of the parties to the insurance contract.

*Williams v. State Farm Fire & Cas. Co.*, 514 S.W.2d 856, 860 (Mo.Ct.App.1974). Jurisdictions that adhere to this traditional definition of collapse are also inclined to follow dictionary meanings of the word. For instance, two definitions of this term are as follows:

> To break down completely; disintegrate his case had collapsed in a mass or legal wreckage—Erle Stanley Gardner. 2: ... fall into a jumbled or flattened mass through the force of external pressure.

*New Collegiate Dictionary* 217 (1979).

> 3. undergo ruin or destruction by or as if by falling down: become dispersed, its passage ripped away the crown of the arch and immediately the whole bridge collapsed—O.S. Nock. a magnetic field collapsing 4: to suddenly lose force, significance, effectiveness, or worth all his annoyance collapsed in a heap—Hamilton Basso collapsing currencies of unstable countries

*Webster's Third New International Dictionary* 443 (1976).

In contrast, the broader and more modern definition of "collapse" followed by the majority of jurisdictions begins with the premise that this term is inherently ambiguous, even if it is qualified through the use of exclusionary terms. *Rankin v. Generali—U.S. Branch*, 986 S.W.2d 237, 238–39 (Tenn.Ct.App.1998). Under this line of reasoning, "collapse" may be considered a state of "substantial impairment of the structural integrity of the building or any part of a building." *See Am. Concept Ins. Co. v. Jones*, 935 F.Supp. 1220, 1226

(D.Utah 1996).[1] Thus, application of the modern view of "collapse" as to what will trigger coverage under an insurance policy is significantly expanded because total destruction of the building is no longer necessary. *Campbell v. Norfolk & Dedham Mut. Fire Ins. Co.,* 682 A.2d 933, 936 (R.I.1996). Instead, coverage under a policy will exist when significant damage to the structural integrity is present, and not every court following the broad definition requires that parts of a building fall at all. *Guyther v. Nationwide Mut. Fire Ins. Co.,* 109 N.C.App. 506, 428 S.E.2d 238, 240 (1993). Thus, a question of fact arises in those cases as to whether a building that has suffered some damage—but not a complete falling down—is in a state of "collapse" so as to trigger coverage under the insurance policy. *See Kay v. United Pac. Ins. Co.,* 902 F.Supp. 656, 659 (D.Md.1995) (observing that summary judgment was inappropriate with respect to whether "collapse" occurred pursuant to an insurance policy where the evidence established that exterior brick panels fell from a building).

When considering both the traditional and modern views as to whether a "collapse" of a building has occurred, we think the modern view is compelling and should be applied here. Although only nine jurisdictions have followed the traditional definition—which none have adopted since 1970—at least fifteen jurisdictions have adopted the broader rule. *See* Annotation, *What Constitutes "Collapse" Of a Building Within Coverage of Property Insurance Policy,* 71 A.L.R.3d 1072 § 3 (1976 & Supp.2002). Moreover, seven of those jurisdictions have adopted this view since 1995 and the most recent adoption of the modern definition occurred in 2002. *Id.*

§ 4. As one case noted, "the clear modern trend is to hold that collapse coverage provisions ... which define collapse as not including cracking and settling—provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building." *American Concept,* 935 F.Supp. at 1227.

■ Applying such a modern view to the circumstances here, Magwerks asserts that the additional coverage "clearly covers the collapse of parts of Magwerks's building under the weight of rain, and the designated evidence proved this was what occurred." Appellee's Br. p. 19. Moreover, it claims that the evidence designated to the trial court shows that a total collapse of a part of the building occurred so the loss was covered by the policy, even under the strict definition of "collapse," in light of the numerous ceiling panels that crashed through the floor. Drums and more than one hundred pails were used to catch the leaking water and Magwerks had to use tarps to protect their equipment from water damage. Magwerks also points out that several sections of the roof had been temporarily braced to prevent further damage. Appellant's App. p. 87–89.

However, when Kelter was deposed in response to the Confidential Risk Report that denied coverage, he testified that the roof "sagged in some areas" but would not "consider it a collapse." Appellant's App. p. 125. A portion of Kelter's July 30, 1997 memorandum to Jenkins indicated that the weight of rain and the poor design of the roof had caused the damage. Appellant's App. p. 103. On the other hand, Moehl

1. Among the cases cited in *American Concept* include: *Thomasson v. Grain Dealers Mut. Ins. Co.,* 103 N.C.App. 475, 405 S.E.2d 808, 809 (1991) (holding that "collapse" is ambiguous because to require a building to fall completely would render coverage illusory); *Nationwide Mut. Fire Ins. v. Tomlin,* 181 Ga. App. 413, 352 S.E.2d 612, 615 (1986) (recognizing that any reasonably detectable serious impairment of structural integrity is collapse).

observed that it was the "long-term infiltration" of the water that caused the damage. Appellant's App. p. 88. Monroe Guaranty further points out that the photographs of the Magwerks's building unquestionably showed that the roof did not fall in, cave in, or lose its shape in any fashion. Appellant's App. p. 137, 87–99. To be sure, Monroe Guaranty points out that most of the roof remained intact and all of the steel support beams remained in place. Appellant's App. p. 87–89. In Monroe Guaranty's view, it is compelling that the roof withstood Kelter's weight when the inspections were performed. Also, because Magwerks remained in business and never completely repaired the roof, Monroe Guaranty insists that there could not have been a "collapse" under the policy.

Considering the designated evidence most favorable to Monroe Guaranty, the nonmoving party, in conjunction with the modern definition of "collapse," it is apparent that a grant of summary judgment in Magwerks's favor was not warranted. Under these circumstances, we cannot say that the trial court's decision was based upon uncontradicted facts as to whether there was a "collapse" within the meaning of the policy. Therefore, because neither party provided the ample designated evidence for the trial court to draw a legal conclusion that the damage was a "collapse," as a matter of law, we must reverse the summary judgment for Monroe Guaranty and remand this cause for trial. A genuine issue of material fact remains as to whether there was a collapse of Magwerks's premises, and the designated evidence fails to establish as a matter of law whether the damage was caused by the weight of the rain that collected on the roof. Inasmuch as we reverse the trial court for these reasons, the award of com-

pensatory and punitive damages is vacated, and we therefore need not address the propriety of the bad faith claim and punitive damages brought by Monroe Guaranty. However, we proceed to consider the cross-claim brought by Magwerks.

### III. Cross–Claim

■ Magwerks's cross-claims regards the payment of punitive damages. Specifically, Magwerks contends that the punitive damages statute is unconstitutional because 75% of the amount awarded is to be paid to the state treasurer.[2] In essence, Magwerks argues that such a provision constitutes an unconstitutional taking of property.

■ We first note that in the event that this case proceeds to trial, punitive damages may not be awarded in light of our determination that a genuine issue of material fact exists as to whether Magwerks's building "collapsed" within the meaning of the policy. As our supreme court observed in *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind.2002), "to prove bad faith, the plaintiff must establish, with clear and convincing evidence that the insurer had knowledge that there was no legitimate basis for denying liability." Moreover, punitive damages in insurance cases may be awarded where there is clear and convincing evidence that the defendant acted with "malice, fraud, gross negligence or oppressiveness." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind.1993). As discussed above, there is a good faith dispute about whether Magwerks had a valid claim against Monroe Guaranty. Therefore, there can be no breach of the obligation to exercise good faith and punitive damages may not be awarded here. *See Freidline*, 774 N.E.2d at 40.

**2.** Ind.Code § 34–51–3–6.

Finally, we note that our supreme court in *Cheatham v. Pohle*, 789 N.E.2d 467 (Ind.2003), recently addressed the precise issue that Magwerks raises on cross-appeal. Specifically, the *Cheatham* court determined that there is no vested property right in an award of punitive damages. As a result, the statute compelling payment of a portion of punitive damages to a victim compensation fund rather than awarding this money to a private citizen "is well within the state legislature's authority." *Id.* at 475. Thus, Magwerks's argument that such a requirement is violative of our constitution fails.

Reversed and remanded.

BROOK, C.J., and SHARPNACK, J., concur.