ATTORNEYS FOR APPELLANT
Todd J. Kaiser
Matthew S. Effland
Ogletree Deakins Law Firm
Indianapolis, Indiana


INTERVENOR
Steve Carter
Attorney General of Indiana

Scott A. Kreider
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
William E. Winingham
Wilson Kehoe & Winingham
Indianapolis, Indiana

Frank D. Otte
Indianapolis, Indiana

AMICUS CURIAE BRIEF OF THE
INDIANA TRIAL LAWYERS
ASSOCIATION
Henry Price
Price Jackson Waicukauski &
   Mellowitz, P.C.
Indianapolis, Indiana

# In the
# Indiana Supreme Court

### No. 49S02-0402-CV-81

MONROE GUARANTY INSURANCE COMPANY,

*Appellant (Defendant below),*

v.

MAGWERKS CORPORATION,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court No. 7, No. 49D07-9902-CP-228
The Honorable Gerald S. Zore, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-0208-CV-622

**June 29, 2005**

**Rucker, Justice.**

This case presents the question of whether a good faith dispute concerning insurance coverage automatically precludes a punitive damages claim for bad faith when coverage is denied. We conclude it does not.

**Facts and Procedural History**

Magwerks Corporation ("Magwerks") sells manufactured camshafts from its one-story, flat-roofed building in Indianapolis. Constructed of tar and asphalt with individual sections measuring 4' x 8', the roof has no separate suspended ceiling. After a period of heavy rain and snow in February 1997, several of the roof sections began falling to the floor. The resultant water and moisture caused damage to several pieces of Magwerks' equipment.

Monroe Guaranty Insurance Company ("Monroe Guaranty") issued an insurance policy to Magwerks in 1996, which included coverage for certain types of damage to its building and equipment. One provision of the policy excluded payment for such things as "wear and tear" and loss or damage "caused by or resulting from rain [or] snow." Appellant's App. at A052. Although not defining the term, one section of the policy excluded coverage for "collapse" but then another section of the policy specifically included such coverage under certain circumstances. More particularly the policy provided in relevant part:

> We will pay for loss or damage caused by or resulting from risks of direct physical loss *involving collapse of a building or any part of a building* caused only by one or more of the following: . . . Weight of rain that collects on a roof . . . .

Id. at at A053 (emphasis added). The policy was in effect in February 1997. Patrick Jenkins, president of Magwerks, submitted a "Property Loss Notice" to Monroe Guaranty describing the loss as follows: "Continuous rain had caused damage to roof, actuall [sic] has collapsed in several areas." Appellant's App. at A085. Paul Kelter, a Monroe Guaranty adjuster, observed "[r]oof damage and collapsed interior ceiling panels." Supp. App. to Br. of Appellee at S147. At Kelter's request, Tim Moehl of McComas Engineering inspected the roof and concluded that ponding on the roof, caused by poor design, had occurred over a long period of time resulting in a number of small roof leaks that affected the structural integrity of the roof deck. Moehl added,

"At the time of our inspection two sections of the roof were collapsed. Several sections of the roof deck have been temporarily braced to prevent further collapse." Appellant's App. at A088.

Monroe Guaranty ultimately forwarded Magwerks a denial letter rejecting Magwerks' claim of loss. The letter cited several exclusions and limitations in the insurance policy which, according to Monroe Guaranty, justified its refusal to pay for the loss. Those included damage caused by wear and tear, decay, deterioration, and defective design. The denial letter did not mention the provisions in the policy concerning collapse coverage.

Magwerks filed a complaint against Monroe Guaranty for breach of the insurance contract. Seeking punitive damages Magwerks also included a claim for lack of good faith and fair dealing. After conducting discovery, both sides filed cross motions for summary judgment on the breach of contract claim. The primary issue in dispute was whether Magwerks' loss was due to a "collapse" of the roof. Because of a lack of Indiana precedent, Monroe Guaranty cited authority from foreign jurisdictions to support its position. The trial court granted summary judgment in favor of Magwerks and the matter proceeded to trial on the issue of contract damages and on Magwerks' claim of lack of good faith and fair dealing. The jury returned a verdict for Magwerks in the amount of 5.1 million dollars, which included 4 million dollars in punitive damages.

On review, the Court of Appeals reversed the judgment of the trial court and remanded the cause for further proceedings. In so doing the court determined: (1) as a matter of first impression, the modern definition of "collapse" should be adopted in Indiana, thereby rejecting the narrower and traditional definition advocated by Monroe Guaranty; (2) under the modern definition there remains a genuine issue of material fact as to whether there was a collapse of Magwerks' roof and therefore the trial court erred in granting summary judgment in Magwerks' favor; and (3) Monroe Guaranty did not act in bad faith because there was a good faith dispute about coverage and thus "in the event that this case proceeds to trial, punitive damages may not be awarded . . . ." Monroe Guar. Ins. Co. v. Magwerks Corp., 796 N.E.2d 326, 334 (Ind. Ct. App. 2003). Also, the court rejected Magwerks' argument that because of the requirement that

3

seventy-five percent of a punitive damages award must be paid to the state treasurer, the punitive damages statute—Indiana Code section 34-51-3-6—is unconstitutional. Id. at 335.

With the exception of that portion of the Court of Appeals' opinion adopting the modern definition of collapse, Magwerks sought transfer challenging the Court of Appeals' determinations. Having previously granted transfer, we now summarily affirm the opinion of the Court of Appeals in all respects except for its treatment of Magwerks' punitive damages claim. See Ind. Appellate Rule 58(A)(2).

**Discussion**

**I.**

What constitutes a collapse has been the subject of a number of articles and treatises.[1] Under the traditional definition, a "collapse" is limited to an event that occurs suddenly and results in complete disintegration. 43 Am. Jur. 2d Insurance § 1282 (2004). This definition typically disallows coverage under an insurance policy where only a "part of a part" of a building falls. Monroe Guaranty v. Magwerks, 796 N.E.2d 326, 332 (Ind. Ct. App. 2003). In short, under the traditional view, collapse coverage applies only if an insured building is reduced to flattened form or rubble. By contrast, the broader and so-called modern definition, which is followed by a majority of jurisdictions,[2] defines "collapse" as a "substantial impairment of the structural integrity of the building or any part of a building." 43 Am. Jur. 2d § 1282.

---

[1] See, e.g., Alan R. Miller et al., What Constitutes a Collapse Under A Property Insurance Policy, 29-WTR Brief 20 (2000); Powell on Real Property §2.02 (Michael Allan Wolf ed., Matthew Bender); Annotation, What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R.3d 1072 § 3 (1976 & Supp. 2002); Paul B. Tarr et al., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 35 Tort & Ins. L. J. 57 (1999).

[2] See, e.g., Ercolani v. Excelsior Ins. Co., 830 F.2d 31, 34 (3rd Cir. 1987) (predicting that New Jersey would follow other states in holding that collapse requires only "serious impairment of structural integrity"). See also Sherman v. Safeco Ins. Co. of America, Inc., 716 P.2d 475, 476 (Colo. Ct. App. 1986) (holding that cracked masonry work, sagging roof, falling bricks, and bowed walls constituted collapse as a matter of law); Beach v. Middlesex Mut. Assur. Co., 532 A.2d 1297, 1299-1300 (Conn. 1987) (noting dictionary definition of collapse as "a breakdown in vital energy, strength, or stamina" and "sudden loss of accustomed abilities," Court held that collapse coverage did not include settling or cracking unless substantial impairment of structural integrity of building ensued); Island Breakers v. Highlands Underwriters Ins. Co., 665 So.2d 1084, 1085-86 (Fla. Dist. Ct. App. 1995) (Cope, J., concurring) (collapse coverage applies if there is a "substantial impairment of the structural integrity" of part of the building); Nationwide Mut. Fire Ins. Co. v. Tomlin, 352 S.E.2d 612, 615 (Ga. Ct. App. 1986)

4

Analyzing arguments in favor of and in opposition to the traditional versus modern view of collapse coverage provisions in property insurance policies, the Court of Appeals declared, "we think the modern view is compelling and should be applied here." Monroe Guaranty, 796 N.E.2d at 333. Applying the modern view to the facts in this case the court found there were genuine issues of material fact as to whether there was a substantial impairment of the structural integrity of Magwerks' building or any part of the building. The court therefore reversed the trial court's grant of summary judgment in Magwerks' favor.

On transfer neither party challenges the Court of Appeals' adoption of the modern view of collapse coverage. We agree with this view as well. However, Magwerks contends that even under the modern view the Court of Appeals improperly reversed the trial court's grant of summary judgment. Magwerks faults the court for what it characterizes as the court's reliance on "Monroe's waived arguments and untimely evidence." Appellee's Pet. To Trans. at 11. Magwerks' claim is premised on the notion that (i) Monroe Guaranty advanced arguments on appeal justifying its denial of coverage that were not presented to the trial court in response to Magwerks' motion for summary judgment, and (ii) Monroe Guaranty's designated evidence in response to Magwerks' motion for summary judgment was not timely filed.

When reviewing a grant or denial of summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Indiana Univ. Med. Ctr., Riley Hosp. for Children v. Logan, 728 N.E.2d 855, 858 (Ind. 2000). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no

(holding that collapse includes any "reasonably detectable serious impairment of structural integrity" because such a definition "more realistically reflects the purposes of the policy"); Gov't Employees Ins. Co. v. DeJames, 261 A.2d 747, 750 (Md. 1970) (holding collapse is ambiguous because verb has restrictive meaning and noun has more liberal meaning, including "breakdown in strength," and thus resolving ambiguity in favor of insured to include any serious impairment of structural integrity); United Nuclear Corp. v. Allendale Mut. Ins. Co., 709 P.2d 649, 652 (N.M. 1985) (holding that settling that impairs the structural integrity of the building constitutes collapse); Royal Indem. Co. v. Grunberg, 155 A.D.2d 187, 189 (N.Y. App. Div. 1990) (agreeing with "numerical majority of American jurisdictions [that] a substantial impairment of the structural integrity of a building is said to be a collapse" because to require the building to fall down would be "unreasonable" in light of an insured's duty to protect property from further damage); Thomasson v. Grain Dealers Mut. Ins. Co., 405 S.E.2d 808, 809 (N.C. Ct. App. 1991) (holding that the word collapse is ambiguous because to "require that the house fall in completely" would render the coverage illusory).

genuine issue of material fact and the moving party deserves judgment as a matter of law. Gunkel v. Renovations, Inc., 822 N.E.2d 150, 152 (Ind. 2005). All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party. Tibbs v. Huber, Hunt & Nichols, Inc., 668 N.E.2d 248, 249 (Ind. 1996).

Magwerks' claim that Monroe Guaranty advanced arguments on appeal that were not presented to the trial court is of no moment in this case. Rather, the question is whether the designated evidence and all inferences derived from that evidence demonstrate there is no genuine issue of material fact and that Magwerks is thus entitled to summary judgment as a matter of law. Concerning the designated evidence, the record is not at all clear that Monroe Guaranty's designation was untimely as Magwerks contends. The Chronological Case Summary (CCS) does show that Magwerks filed its Motion for Summary Judgment and designation of supporting materials on December 11, 2001. Appellant's App. at A006. The CCS also shows that Monroe Guaranty filed its response, cross motion for summary judgment, and designated materials on January 11, 2002. Id. Indiana Trial Rule 56(C) provides in pertinent part, "An adverse party shall have thirty (30) days after service of [a motion for summary judgment] to *serve* a response and any opposing affidavits" (emphasis added). Therefore, at first blush it does appear that Monroe Guaranty's response was one day late. When a party fails to file a response within thirty days, the trial court may not consider materials filed thereafter. Borsuk v. Town of St. John, 820 N.E.2d 118, 124 n.5 (Ind. 2005); Markley Enterprises, Inc. v. Grover, 716 N.E.2d 559, 563 (Ind. Ct. App. 1999); Carroll v. Jagoe Homes, Inc., 677 N.E.2d 612, 616 n.1 (Ind. Ct. App. 1997); Seufert v. RWB Med. Income Properties I Ltd. Partnership, 649 N.E.2d 1070, 1073 (Ind. Ct. App. 1995). Thus, if the trial court in fact considered untimely submissions in this case, then Magwerks' claim of error may be of some merit.

However, there is nothing in this record showing when Monroe Guaranty "served" its response on Magwerks. The record merely shows the date on which Monroe Guaranty's response was filed with the trial court. We thus cannot say as a matter of fact Monroe Guaranty's response was late at all. More importantly, the record does not show that Magwerks objected to the alleged untimely submissions, either by a motion to strike or otherwise. See, e.g.,

Logan, 728 N.E.2d at 858 (rejecting claim that trial court erred in failing to strike untimely affidavit filed in opposition to motion for summary judgment). Failure to object waives the issue for review. Francies v. Francies, 759 N.E.2d 1106, 1113 (Ind. Ct. App. 2001).

Waiver notwithstanding, and even assuming Monroe Guaranty's submissions were untimely and thus inadmissible, Magwerks still cannot prevail on this issue. The record shows that in support of its motion for summary judgment Magwerks submitted, among other things, an engineering report compiled by Tim Moehl of McComas Engineering, Inc. The report says in part:

> The building was constructed with inadequate roof slope to properly relieve rainwater from the structure. Although the roof was maintained annually, the lack of roof slope has caused rainwater to pond on the roof covering. The long-term ponding conditions, eventually *affected the structural integrity of the roof deck*. Rainwater infiltrates the underlying structure when it is allowed to pond. . . . Due to the extent of damage to the existing deck, the removal of the existing deck is warranted. Any repairs to the existing deck cannot be accomplished due to the extent of existing damage.

Appellant's App. at A088 (emphasis added). On the other hand Magwerks submitted a portion of a deposition of Paul A. Kelter, a Monroe Guaranty adjuster. When asked whether he agreed or disagreed that the "roof collapsed in several areas," Kelter responded, "I would say it [the roof] sagged in some areas, but we wouldn't consider it a collapse." Id. at A022. Kelter also testified that after receiving the engineering report he conducted his own investigation of the building which included climbing onto the roof to take photographs. Id. at A027. The reasonable inference to be drawn from this evidence is that at most the structural integrity to a part of the building—namely, the roof—may have been compromised. However, neither the foregoing evidence, nor the remainder of Magwerks' Rule 56 materials, fails to eliminate a genuine issue of material fact as to whether the building or any part thereof suffered "*substantial impairment* of [its] structural integrity." Monroe Guaranty, 796 N.E.2d at 332 (emphasis added).

A party moving for summary judgment bears the initial burden of showing no genuine issue of material fact and the appropriateness of judgment as a matter of law. If the movant fails

7

to make this prima facie showing, then summary judgment is precluded regardless of whether the non-movant designates facts and evidence in response to the movant's motion. Tankersley v. Parkview Hosp., Inc., 791 N.E.2d 201, 203-04 (Ind. 2003). In this case, even if Monroe Guaranty's designated materials were excluded from consideration, Magwerks' failure to carry its initial burden of showing that the structural integrity to its building or any part thereof suffered substantial impairment is fatal to Magwerks' coverage claim. We therefore summarily affirm the opinion of the Court of Appeals reversing the trial court's grant of summary judgment in Magwerks' favor.

## II.

Monroe Guaranty contends that Freidline v. Shelby Ins. Co., 774 N.E.2d 37 (Ind. 2002) controls the outcome of this case supporting the proposition that Magwerks should not be allowed to pursue a claim for punitive damages on remand. In Freidline, several employees who worked in a building owned by John and Donna Freidline complained that fumes from carpet glue made them sick. The employees sued the Freidlines who in turn contacted their insurance carrier, Shelby Insurance Company. Citing a pollution exclusion in the insurance policy, Shelby denied the claim and refused to defend the Friedlines in the underlying action. The Freidlines contended that Shelby had no legitimate basis for denying coverage and thus acted in bad faith. And this was so, according to the Freidlines, because existing Indiana case authority had found the definition of pollutants ambiguous and thus had consistently construed the pollution exclusion against insurance companies. Id. at 40. We agreed with the Freidlines that precisely because of existing authority, Shelby was in breach of the insurance contract by failing to pay for the coverage and in failing to provide the Freidlines with a defense to the lawsuit that the employees had filed against them. Id. at 42. However, we noted that Shelby had distinguished the existing case authority, and we observed that the scope of the pollution exclusion was an evolving area of the law subject to differing interpretations.

Affirming the trial court's grant of summary judgment in Shelby's favor we concluded, "Inasmuch as we find there is a rational basis for Shelby's actions, and Shelby supports its position with good faith legal argument, the Freidlines have failed to establish by clear and

convincing evidence that Shelby breached its duty to act in good faith." Id. Before reaching this conclusion we articulated the long recognized rule that insurers have a duty to deal in good faith with their insureds. Id. at 40 (citing Erie Ins. Co v. Hickman, 622 N.E.2d 515, 518 (Ind. 1993)). We emphasized that a good faith dispute over whether an insured has a valid claim will not support the grounds for recovery in tort for the breach of the obligation to exercise good faith. Friedline, 774 N.E.2d at 40. We then said, "*To prove bad faith*, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." Id. (emphasis added). It is this quote upon which our colleagues on the Court of Appeals partly relied to reach the conclusion that "punitive damages may not be awarded in light of our determination that a genuine issue of material fact exists as to whether Magwerks's building 'collapsed' within the meaning of the policy." Monroe, 796 N.E.2d at 334. The quote also provides the underlying basis for Monroe Guaranty's contention that Magwerks is not entitled to punitive damages. According to Monroe Guaranty, just as in Freidline, here there was also a legitimate basis for denying the insured's claim, namely: the lack of Indiana precedent on the meaning of "collapse" and a number of cases from foreign jurisdictions defining the term in a way that would preclude coverage on the facts presented here.

If the allegations of bad faith in this case rested solely on a dispute about coverage then Monroe Guaranty would be correct. We reaffirm that a good faith dispute concerning insurance coverage cannot provide the basis for a claim in tort that the insurer breached its duty to deal in good faith with its insured. See Hickman, 622 N.E.2d at 520; Hoosier Ins. Co v. Audiology Found. of America, 745 N.E.2d 300, 310 (Ind. Ct. App. 2001), trans. denied; Becker v. American Family Ins. Group, 697 N.E.2d 106, 108 (Ind. Ct. App. 1998). And "[t]his is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." Hickman, 622 N.E.2d at 520. But an insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim. And Freidline should not be read to suggest otherwise. In that case the only dispute at issue concerned a good faith difference of opinion over whether a claim was or was not covered. As a result we said "[t]o prove bad faith" etc. the plaintiff must establish "that the insurer had knowledge that there was no legitimate basis for denying liability." Freidline, 774

N.E.2d at 40. This was not meant however to suggest that this is the only way to demonstrate bad faith.

In Hickman we specifically declined to determine the precise extent of an insurer's duty to deal in good faith. Instead we made a few general observations as follows:

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

622 N.E.2d at 519. In this case Magwerks asserts that the duty to deal in good faith includes also the "manner of handling the claim." Pet. to Trans. at 4. Magwerks does not elaborate on the contours of this duty. And because neither party provides us with much guidance on the issue, we decline at this time to expand on the extent of the duty an insurer owes its injured beyond those we have already expressed in Hickman.

Nonetheless, from our review of the record, it appears that Magwerks' claim is that from the very beginning Monroe Guaranty knew that the roof had collapsed. According to Magwerks, there was never any dispute on this point. In support of its contention Magwerks points out, for example, that: (i) it submitted a loss of claim notice identifying the problem as a collapsed roof due to rain; (ii) Monroe Guaranty's adjuster observed "[r]oof damage and collapsed interior ceiling panels"; (iii) an independent engineering firm hired by Monroe Guaranty noted that "two sections of the roof were collapsed" and that "[s]everal sections of the roof deck [had] been temporarily braced to prevent further collapse"; and (iv) in its letter denying coverage, Monroe Guaranty made no reference to the collapse provision of the policy. See Supp. App. to Br. of Appellee at S147; Oral Arg. Ex. 7; Appellant's App. at 88. Magwerks suggests that Monroe Guaranty's asserted denial of coverage based on its understanding of the meaning of the term

10

collapse was a manufactured excuse appearing for the first time in Monroe Guaranty's answer to Magwerks' complaint for damages.[3]

As a general proposition, "[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." Colley v. Indiana Farmers Mut. Ins. Group, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998), trans. denied. Here, apart from Monroe Guaranty's denial of Magwerks' claim based on a good faith dispute over whether coverage did or did not exist, the question is whether Monroe Guaranty's conduct leading up to and including the issuance of the denial letter rose to the level of bad faith. Stated somewhat differently, before Magwerks filed its complaint, did Monroe Guaranty essentially acknowledge that the cause of Magwerks' loss was a "collapse of a building or any part of a building caused [by the] [w]eight of rain that collects on a roof"? Appellant's App. at 53. If so, then a jury could reasonably have reached the conclusion that Monroe Guaranty's conduct amounted to "an unfounded refusal to pay policy proceeds." Hickman, 622 N.E.2d at 519. In the end this is the jury's call. And the jury has already decided this issue in Magwerks' favor. We find no error.

### III.

Finally, before the Court of Appeals, Monroe Guaranty also argued that the amount of punitive damages was excessive. In support, Monroe Guaranty cited State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) (reversing a decision of the Utah Supreme Court, which upheld a jury award of $145 million in punitive damages upon an award of $1 million in compensatory damages). Because the Court of Appeals reversed the judgment of the trial court on other grounds, it did not address this issue. We do so here but only to note that this issue is waived because Monroe Guaranty made this claim for the first time in its reply brief. The law is

---

[3] Specifically Magwerks claims: "The trial evidence viewed in the light most favorable to the verdict was overwhelming that Monroe knew it had no rational basis to deny the claim, misled Magwerks by offering a pretense for denial, failed to explain the basis for its denial, failed to construe the policy in the light most favorable to its insured, and, when sued, fabricated a pretense for denial. This pattern of misconduct allowed the jury to infer bad faith, and Monroe's use of pretenses to cover its misconduct proved its consciousness of its culpability." Br. of Appellee at 36. In Magwerks' view, "Monroe knew this was a 'collapse' under the policy." Id. at 38.

well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived. See French v. State, 778 N.E.2d 816, 826 (Ind. 2002) (holding that the appellant waived an issue by not raising it in his principal brief); Crossmann Communities, Inc. v. Dean, 767 N.E.2d 1035, 1044 (Ind. Ct. App. 2002) (issues raised for the first time in a reply brief are deemed waived); see also Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief.").

Monroe Guaranty counters that Campbell, which was handed down April 7, 2003, over three months after Monroe Guaranty filed its initial brief, "provides new guidance in the evaluation of punitive awards" and therefore Monroe Guaranty's "failure to raise this constitutional issue in its initial brief should not constitute a waiver of the issue . . . ." Reply Br. of Appellant at 47. We observe that although Campbell may very well have provided additional guidance on the subject of punitive damages awards, it certainly did not announce a new rule of constitutional law. In fact the Campbell Court cited extensively from BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), a case in which the Court refused on due process grounds to sustain a $2 million punitive damages award which accompanied a jury verdict of only $4,000 in compensatory damages. As the Campbell Court declared, "[u]nder the principles outlined in [Gore] this case is neither close nor difficult." Id. at 418. In sum, the Court in Campbell merely reaffirmed what it had already declared in Gore. As such, Monroe Guaranty's attempt to avoid waiver on the ground that Campbell announced a new rule of constitutional law is unavailing.

### Conclusion

We hold that a good faith dispute concerning insurance coverage does not automatically preclude a punitive damages claim for bad faith when coverage is denied. We therefore vacate that portion of the Court of Appeals opinion holding to the contrary. In all other respects we summarily affirm the opinion of the Court of Appeals, under which the judgment of the trial court is reversed and this cause remanded for further proceedings.

Dickson and Boehm, JJ., concur.
Shepard, C.J., concurs in result with separate opinion.
Sullivan, J., dissents with separate opinion.

**SHEPARD, Chief Justice, concurring in result.**

I join in the decision to reverse and remand for a new trial, including Magwerks' claim for breach of contract.

I do not embrace what my colleagues have to say about the standard under which a party may be sanctioned for raising novel legal claims during the course of a dispute. Here, the central legal issue has been: "What's the Indiana definition of the word 'collapse' in an insurance contract?" Our Court of Appeals called this a "question of first impression" and our Court acknowledges "a lack of Indiana precedent" and examines at some length both decisions in other jurisdictions and various scholarly works in the search for useful analysis.

In the end, the Court holds that sanctioning the party that raised this question of first impression is appropriate for two reasons: the participants to the dispute frequently used the word "collapse" and the jury found that the party who advanced the claim had no good faith reason for doing so. This merely declares a legal answer by repeating the question.

It also moves us some distance away from our previous position that courts ought not impose sanctions on litigants who advance novel and plausible legal contentions.

**Sullivan, Justice, dissenting.**

I respectfully dissent from the Court's conclusion that the trial court improperly granted summary judgment to Magwerks on the question of whether Magwerks's building's roof had suffered a "collapse." In my view, the evidence designated by Magwerks in support of its motion for summary judgment was sufficient to establish that there had been "collapse" as a matter of law and Monroe Guaranty's response did not establish a genuine issue of material fact with respect thereto.

The roof and ceiling in question consisted of approximately four foot-by-eight foot sections. Photographs in the record, the deposition testimony of Magwerks's president, Patrick Jenkins, the deposition testimony of Monroe Guaranty's adjuster, Paul A. Kelter, and the written report of an engineering firm, McComas Engineering, Inc., engaged by Monroe Guaranty to inspect Magwerks's building all indicate that at least two of the sections dropped all the way down to the ground from the ceiling. (App. at 148-154, 157-158, 35, and 88.) The McComas report actually says that "two sections of the roof were collapsed." (App. at 88.) Kelter also used the word "collapse" in a Monroe Guaranty "Confidential Risk Report" (App. at 103; "collapsed interior ceiling panels"), but later testified in his deposition that this "was a poor, improper use of the word it appears (App. at 34). Reviewing this evidence in the light most favorable to Monroe Guaranty, the material fact of the roof's condition simply was not in dispute and the legal question for the trial court was whether this condition constituted a collapse. A collapse, according to the Court, is "a substantial impairment of the structural integrity of the building or any part of the building." I see no genuine issue of material fact but that there was a substantial impairment of the structural integrity of part of Magwerks's building. I believe summary judgment was properly entered in Magwerks's favor on that issue.

I would affirm the judgment of the trial court.