Virginia HARTMAN and Suzanne Swinehart, Appellants–Defendants,

v.

Dr. Gabe KERI, Appellee–Plaintiff.

No. 02A03–0603–CV–135.

Court of Appeals of Indiana.

Dec. 27, 2006.

Karen R. Orr, Stuart & Branigin LLP, Lafayette, IN, Attorney for Appellants.

Swaray E. Conteh, The Law Office of Swaray Conteh, LLC, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Suzanne Swinehart and Virginia Hartman bring this interlocutory appeal following the trial court's denial of their motion for summary judgment. We address a single dispositive issue on review, namely, whether communications made in the course of official proceedings brought under the antiharassment policies of The Trustees of Purdue University ("Purdue") are protected by an absolute privilege.

We reverse.

### FACTS AND PROCEDURAL HISTORY

In August of 2000, Dr. Gabe Keri became an Assistant Professor of Education in the School of Education at Indiana University–Purdue University at Fort Wayne ("IPFW"). IPFW is jointly owned by The Trustees of Indiana University and Purdue, but is managed by Purdue pursuant to an agreement between the two universities. Keri worked under one-year, renewable contracts that made him eligible for tenure after seven years. However, on April 3, 2003, Dr. Utesch, Keri's supervisor, notified Keri that his employment contract would not be renewed for the 2004–2005 academic year due to unsatisfactory performance.

Swinehart and Hartman had enrolled as graduate students in the School of Education at IPFW in 2000 and 2001, respectively. Swinehart and Hartman both had been employed as Graduate Aides in Education at IPFW. As graduate students at IPFW, Swinehart and Hartman were good friends and worked together. Hartman's worst grade as a graduate student was a "B," which she received in a class taught by Keri in the summer of 2002. Hartman contested that grade to a review committee in a nine-page document, but subsequently abandoned her appeal.

On May 12, 2003, just over a month after Keri received his notice of nonrenewal, Swinehart and Hartman each filed formal complaints ("the Purdue complaints") with IPFW's Affirmative Action Office alleging harassment by Keri. Hartman's complaint also alleged that Keri discriminated and retaliated against her. Among Hartman's assertions was an allegation that Keri retaliated against her by "affecting my grade point average." Appellants' App. at 111. Swinehart claimed that Keri had made inappropriate sexual comments to her personally and to her class between July 2001 and the spring of 2002.

The Purdue complaints were filed pursuant to Purdue's policy for addressing "harassment in the workplace or the educational environment." Id. at 346. That policy is contained in Executive Memoran-

dum No. C–33 ("C–33") and is implemented by Purdue's Procedures for Resolving Complaints of Discrimination and Harassment ("Procedures"). Both documents apply to IPFW. C–33 states that it "seeks to encourage faculty, staff, and students to report and address incidents of harassment." *Id.* at 348. C33 defines harassment to include the creation of a hostile educational environment. Further, C–33 provides:

> This policy shall not be used to bring knowingly false or malicious charges against any faculty, staff, students, or recognized student organizations.... Disciplinary action will be taken against any person or group found to have brought a charge of harassment in bad faith, or any person who, in bad faith, is found to have encouraged another person or group to bring such a charge.

*Id.*

The Procedures stipulate, among other things, that "[t]he proceedings under these Procedures are not those of a court of law, and the presence of legal counsel for the parties is not permitted during the conduct of these Procedures." *Id.* at 353. The Procedures require that "a Formal Complaint must be filed ... within ten days of the conclusion of the Informal Process or 120 days following the incident of discrimination and/or harassment." *Id.* at 355. Here, the Procedures required the initiation of a proceeding ("the antiharassment proceeding") to investigate the merits of the Purdue complaints. As a first step, the Chancellor of IPFW assigned Dr. Elaine Blakemore, Chair of the Department of Psychology at IPFW, to investigate. Blakemore concluded that Keri had created a hostile educational environment for both Swinehart and Hartman and had harassed Hartman.

Following the expiration of his final contract with IPFW, on June 10, 2004, Keri brought a federal lawsuit ("the federal complaint") in the Northern District of Indiana against IPFW and five "DOE" defendants.[1] The federal complaint was based on various federal laws, most notably Title VII of the Civil Rights Act of 1964 ("Title VII"), and related state laws under the Indiana Tort Claims Act ("ITCA"), namely, intentional and negligent infliction of emotional distress, negligent supervision, and wrongful termination. Keri alleged, under Title VII, that Dr. Utesch, Swinehart, and Hartman "conspired to smear [Keri's] reputation by making false and unfounded allegations of sexual harassment and ineffective teaching methodologies." *Id.* at 169–70.

On November 9, 2005, the federal district court granted complete summary judgment in favor of Purdue based on Keri's inability to establish the requisite prima facie cases. In the "Material Facts" section of its opinion, the district court discussed Keri's performance, the Purdue complaints, and the antiharassment proceeding. The court stated, in relevant part:

> (c) [Keri's] Third Evaluation and Academic Year 2002–2003 Performance
>
> * * *

---

1. Keri subsequently amended his complaint to name Purdue as the defendant in place of IPFW, although the five DOE defendants remained. However, in her Opinion and Order on the Motion for Summary Judgment, District Court Judge Springman stated that Keri conceded that he could not proceed against the fictitious defendants under the federal causes of action either because he could not positively identify them by the end of discovery or because the two-year statute of limitations had run. *Keri v. Bd. of Trs. of Purdue Univ.*, No. 1:04–CV–224, 2005 WL 4715211, at *14, 2005 U.S. Dist. LEXIS 43183, at *41–42 (N.D.Ind. Nov. 9, 2005), *aff'd*, 458 F.3d 620 (7th Cir.2006).

[S]tudent complaints against [Keri] continued during the 2002–2003 academic year. In March 2003, [Swinehart,] a graduate student employee at IPFW, approached Dr. Utesch and reported that [Keri] had made inappropriate comments to her during her interview for a clinic manager's position. She reported that, in the summer of 2001, [Keri] had told her that she should wear tighter pants and that she did not have big enough "boobs" because she was white. Also in March 2003, a second graduate student employee, [Hartman], reported to Dr. Utesch that during his classes [Keri] bashed homosexuals and Catholics. Dr. Utesch believed [Hartman] because her complaints were consistent with those from other students in other classes taught by [Keri]. . . .

(d) [Keri's] Final Evaluation and Non-reappointment

From November 2001 through March 2003, Dr. Utesch received six student complaints about [Keri]. Two of them were anonymous. All of them accused [Keri] of inappropriate behavior. On the basis of these complaints, and especially on the basis of [Swinehart] and [Hartman's] complaints, Dr. Utesch decided not to recommend [Keri] for reappointment for the 2004–2005 academic year. On March 31, 2003, he wrote concerning [Keri's] conduct:

> On-going student complaints have become more serious over the past year. I have had several meetings with [Keri] to attempt to resolve concerns about his teaching effectiveness and his professionalism. There appear to be no changes.
>
> Students continue to be subjected to discussion of inappropriate topics irrelevant to the content of the course within the classroom. He has criticized other faculty and students in public settings. His lectures are often unorganized and ineffective. He has consistently failed to fulfill his responsibilities for supervising students in the clinic setting. The School of Education's protocol for the formal evaluation of faculty by students has been violated because [Keri] did not leave the room while students were completing evaluations. Female students report inappropriate comments about their appearance. The trust and respect of students has been diminished by misuse of power. I conclude that his teaching performance is unsatisfactory.

\* \* \*

(e) IPFW's Investigation of Formal Complaints Against [Keri]

On May 12, 2003, [Swinehart] and [Hartman] each filed a formal complaint against [Keri], claiming that he harassed and discriminated against them in both the classroom and in their work as graduate assistants. Elaine Blakemore was assigned by Chancellor Wartell to investigate the complaints in accordance with IPFW's procedures. She interviewed the complainants and [Keri], as well as Dr. Utesch and two other faculty members in the Department of Education Studies. She also interviewed thirteen current and former students from the Counselor Education program representing four different academic cohorts. Blakemore issued a detailed report with extensive findings on both students' complaints. In the report she acknowledged that, because of the gravity of [the] allegations, the investigation was difficult for her personally. She noted that, during the investigation, [Keri] was cordial and professional, and that he was bewildered by the charges. She also stated that she found both complainants credible and genuinely anguished about

their experiences. Blakemore commended [Swinehart] and [Hartman] for their courage to come forward with their complaints:

> Finally, I would like to express my utmost respect toward [Swinehart] and [Hartman] for their courage coming forward with their complaints. I spoke to several other students who believed that they had been harmed by [Keri], but were afraid to speak, lest their future careers be harmed. I spoke to former students who said that they had wanted to report their concerns about his behavior once they left the university, but they never had, and that they felt distressed and guilty that they had not. Hence the university should applaud those who are willing to come forward with a serious complaint at possible risk to themselves, particularly when they are taking the risk partly for the good of others.

Blakemore interviewed numerous students and asked them general questions about the School of Education and [Keri]. Blakemore noted that some of the students were very supportive of [Keri] and had no complaints at all; others corroborated the complainants:

> Some expressed shock and dismay about how disrespectfully they thought that other students treated him in the classroom. On balance, though, the majority of students to whom I spoke provided examples of experiences that were consistent with [Hartman] and [Swinehart's] complaints. Since I did not speak to every student who had ever taken a class from [Keri], I cannot possibly know what percentage of students over the few years … found his behavior inappropriate. I can say, however, that many of the students and former students to whom I spoke

found several aspects of his behavior inappropriate, and that their accounts were startlingly consistent.

Blakemore concluded her report by finding that [Keri] violated the university's policies as to the one complainant, but not as to the other:

> Using the standard of the "preponderance of the evidence" required by the Purdue University procedures, I find that [Keri] has violated the Purdue University antiharassment policy outlined in Executive Memorandum C–33. With respect to the specific complaints, I find that Ms. [Hartman] has experienced a hostile educational environment, and that she is the victim of harassment. In her complaint she indicated that she had been the victim of discrimination, but I do not find that to be the case. Other students were similarly treated, and I do not know on what grounds she could have experienced discrimination. Largely because her complaints were not reported in the appropriate time frame, I cannot find that Ms. [Swinehart] has also been specifically harassed under the Purdue policy. However, like other students in the Counselor Education Program, she has certainly been subjected to [a] hostile educational environment.

In light of her findings, Blakemore recommended that [Keri] "be immediately removed from his teaching and practicum supervision responsibilities, and from supervisor contact with students in the School of Education at IPFW." However, she believed that the university should honor his 2003–2004 academic year contract, and that he should be allowed to continue his research so long as he [ ] was veiled from interaction with students.

Blakemore presented her report to the University's Committee on Equity, which concurred with Blakemore's conclusions. On August 4, 2003, Chancellor Wartell notified [Keri] that, for the 2003–2004 academic year, he would be assigned to a position entirely dedicated to research, but that he would not be permitted to use his university office. On August 2, 2003, [Keri] filed a charge of discrimination with the Equal Employment Opportunity Commission, claiming that [Purdue] discriminated against him on the basis of race and national origin.[2]

*Keri v. Bd. of Trs. of Purdue Univ.*, No. 1:04–CV–224, 2005 WL 4715211, at *8–9, 12–13, 2005 U.S. Dist. LEXIS 43183, at *24–27, 33–37 (N.D.Ind. Nov. 9, 2005), *aff'd*, 458 F.3d 620 (7th Cir.2006) (citations omitted) ("*Keri I* ").

The district court went on to grant summary judgment in favor of Purdue. Regarding Keri's inability to establish a prima facie case on his Title VII claims, the district court stated the following:

[Keri] challenges his non-reappointment only by calling into question the reliability of the students' complaints and by referring to his previous positive evaluations. [Keri], who bears the burden to show pretext, does not provide the Court with a reason to believe that Dr. Hannah [the Vice Chancellor of Academic Affairs] or Dr. Utesch simply made up the stories of the students' complaints, by themselves or in collaboration with the students. He refers to Dr. Utesch's conversation with [Swinehart] and [Hartman] at the racquet club as indication of conspiracy, but he is unable to supply any basis for this claim. Further, he states that [Hartman] hated [Keri] because she received a "B" in his

class: "she set out a plot to malign him. Utesch and [Swinehart] got on board and set out a course that has resulted in the utter destruction of [Keri's] career in academia." Again, [Keri] does not single out any part of the record to support these allegations. Finally, [Keri] points to Blakemore's report as a document that exonerates him of [Swinehart] and [Hartman's] allegations. However, such assertion is a stretch.

*Id.* at *20, 2005 U.S. Dist. LEXIS 43183, at *60–61 (footnote and citation omitted). The district court dismissed Keri's tort claims against Purdue for intentional and negligent infliction of emotional distress as untimely. In the alternative, the district court dismissed those claims along with the negligent supervision and wrongful termination claims because Keri failed to provide any evidentiary support. On appeal, the Seventh Circuit Court of Appeals affirmed and adopted the district court's opinion.

While the federal complaint was pending before the district court, on March 25, 2005, Keri filed the instant lawsuit in the Allen Superior Court against Swinehart and Hartman. In it, Keri reasserted that Dr. Utesch, Swinehart, and Hartman "concocted a scheme in which Hartman and Swinehart would file false complaints of sexual harassment against [Keri]." Appellants' App. at 3. Keri then alleged that Swinehart and Hartman committed slander against him in the months preceding the antiharassment proceeding, that they committed libel in the Purdue complaints, and that they maliciously interfered with his employment contract.

Swinehart and Hartman moved for summary judgment. During oral argument, Keri clarified that he was only challenging the contents of the Purdue complaints as

---

**2.** Keri is a black man and a native of Ghana.

defamatory. The trial court granted the motion for summary judgment on the allegation of malicious interference with Keri's employment contract. The trial court denied the motion on the defamation issues, stating that Keri's claims were not barred by the ITCA or collateral estoppel, and that, "[w]hile there may be merit" to the argument that the antiharassment proceeding was quasi-judicial and therefore protected by an absolute privilege, "this Court will defer to the Indiana courts of appellate review to establish such a policy." *Id.* at 621. The trial court then found a genuine question of material fact existed on the issue of whether Swinehart and Hartman had abused the protection of qualified privilege that the trial court extended to the antiharassment proceeding. The trial court certified its order for interlocutory appeal, which we accepted.

## DISCUSSION AND DECISION

When reviewing a grant or denial of summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 973 (Ind. 2005). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. *Id.* All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party. *Id.* However, questions of law are reviewed *de novo.* *See Tippecanoe County v. Ind. Mfrs. Ass'n*, 784 N.E.2d 463, 465 (Ind.2003)

Keri alleges that Swinehart and Hartman, in the Purdue complaints, committed tortious acts of defamation against him. However, causes of action based on defamation may not be actionable if the purported tortious statements are subject to a privilege. In Indiana, there are two types of privilege available to protect purportedly defamatory comments, absolute privilege and qualified privilege. *See Trotter v. Ind. Waste Sys., Inc.*, 632 N.E.2d 1159, 1162 (Ind.Ct.App.1994). If a statement is made under circumstances where it is absolutely privileged, no right of action accrues even though the statement would otherwise have been actionable. *Id.*

Absolute privilege or immunity in the judicial setting is well-established in Indiana law. *See, e.g., H.B. v. State*, 713 N.E.2d 300, 302 (Ind.Ct.App.1999), *trans. denied.* "[P]articipants in a judicial proceeding, including judges, attorneys and witnesses are absolutely immune from liability for their judicial actions.... [T]he common law provides absolute immunity for all persons who are integral parts of the judicial process." *Hamed v. Pfeifer*, 647 N.E.2d 669, 672 (Ind.Ct.App.1995) (citing *Briscoe v. LaHue*, 460 U.S. 325, 334–36, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)). That principle also extends to statements contained in judicial pleadings if those statements are pertinent and relevant to the litigation. *See Trotter*, 632 N.E.2d at 1162. "The underlying purpose of the immunity is to preserve judicial independence in the decision-making process.... [T]he same policies that underlie the grant of absolute judicial immunity to judges justify the grant of immunity to non-judicial officers who perform quasi-judicial functions." *H.B.*, 713 N.E.2d at 302.

Qualified privilege or immunity also is well-established in Indiana law. *Ind. Nat'l Bank v. Chapman*, 482 N.E.2d 474, 479 (Ind.Ct.App.1985), *trans. denied.* In *Chapman*, we stated:

The rule concerning a qualified privilege is that a communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is privileged.

*Id.* (citations and quotations omitted). Such privileges are "qualified" because they:

do[ ] not change the actionable quality of the words published, but merely rebut[ ] the inference of malice that is imputed in the absence of privilege. In an appropriate case, a trier of fact may determine the privilege was abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said. And although the term "malice" is frequently applied in viewing such acts, it appears the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists.

*Id.* at 479–80 (citations and quotations omitted).

■■■■ Regarding privileges as applied to purportedly defamatory judicial complaints, we stated in *Briggs v. Clinton County Bank & Trust Co.*, 452 N.E.2d 989, 997 (Ind.Ct.App.1983), *trans. denied*, that "parties ... are absolutely privileged to publish defamatory matter in the course of judicial proceedings, with the qualification that the statements must be pertinent and relevant to the case." We explained the rationale for applying that privilege as follows:

The reason underlying this doctrine is that public interest in the freedom of expression by participants in judicial proceedings, uninhibited by the risk of resultant suits for defamation, is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged.

*Id.* The question of relevance or pertinence operates as a qualification of the rule of absolute privilege and, like the application of the privilege itself, is a question of law. *Id.*

■■■■ However, absolute privilege is only granted when it is essential to protect the integrity of the judicial process. *Lake County Juvenile Court v. Swanson*, 671 N.E.2d 429, 435 (Ind.Ct.App.1996). In Indiana, courts are hesitant and cautious in applying absolute judicial privilege to areas outside the traditional adversarial process, such as quasi-judicial acts. *Id.* Nevertheless, there is no categorical rule in Indiana for determining when and where to apply an absolute privilege. Rather, in determining whether a person is entitled to an absolute judicial privilege, we have adopted a function-based test, looking to the nature of the function performed and not the identity of the actor who performed it. *H.B.*, 713 N.E.2d at 302 (citing *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)).

Courts with jurisdiction in Indiana have had occasion to address the application of privileges in settings outside the traditional courtroom. For example, absolute judicial privilege has been applied to probation officers assisting a juvenile court in placing children with foster families, as well as to case workers at the Division of Family and Children who assisted the juvenile court with the care and custody of children. *Id.* at 302–03. Both of those scenarios were justified under the rationale that those roles were "intimately associated with a judicial proceeding." *Id.* at 302. Absolute

privilege also has been extended to some administrative proceedings in Indiana, such as with the Indiana Civil Rights Commission, on the rationale that "[s]ince immunity is justified and defined by the functions it protects and serves, not the person to whom it attaches, the Commissioners [of the Indiana Civil Rights Commission] are entitled to absolute quasi-judicial immunity." *Crenshaw v. Baynerd,* 180 F.3d 866, 868 (7th Cir.1999) (quotation omitted). On the other hand, we have extended a qualified privilege to more informal, but still important, communications "between employers and employees, business partners, members of fraternal organizations, creditors and credit agencies," *Gatto v. St. Richard Sch., Inc.,* 774 N.E.2d 914, 925 (Ind.Ct.App.2002), a school's communications to parents regarding the employment status of faculty members or administrative personnel, *id.,* and communications made to law enforcement officers in the course of an investigation, *Chapman,* 482 N.E.2d at 479.

Swinehart and Hartman maintain that their comments in the Purdue complaints are protected by an absolute privilege. Specifically, they contend that their statements were made pursuant to both an actual judicial and a quasi-judicial proceeding and, therefore, they should be entitled to the protection of absolute privilege. The issues of whether the antiharassment proceeding was judicial in nature, and, if so, whether the Purdue complaints are protected by an absolute privilege are issues of first impression in Indiana courts.

### The Nature of the Antiharassment Proceeding

Swinehart and Hartman first contend that their filing of the Purdue complaints was "a necessary prerequisite to an actual judicial process." Appellants' Brief at 16. Specifically, they maintain that, had they not filed the Purdue complaints and instead proceeded directly to court against Purdue claiming a hostile education or work environment, they would be subject to the affirmative defense that they failed to take advantage of Purdue's internal preventative or corrective opportunities. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In support, they call attention to the rule that absolute privilege "applies to communications preliminary to a proposed judicial proceeding where the communication has some relation to a proceeding that is reasonably contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding." *Van Eaton v. Fink,* 697 N.E.2d 490, 495 (Ind.Ct.App.1998) (citing Restatement (Second) of Torts § 588 (1977)). The *Van Eaton* rule requires a showing of good faith, and the premise of the instant action is that Swinehart and Hartman lacked good faith. However, we need address that issue only if we find that the antiharassment proceeding itself is not judicial in nature.

 Swinehart and Hartman contend that the antiharassment proceeding was a quasi-judicial exercise of judicial functions and, therefore, should be extended absolute judicial privilege. Quasi-judicial proceedings are proceedings in which there is an exercise of the judicial function without a judge. *Lincoln v. Bd. of Comm'rs,* 510 N.E.2d 716, 721 (Ind.Ct. App.1987). In *Lincoln,* we identified some salient factors of the judicial function required for quasi-judicial proceedings:

> While it is difficult, if not impossible, to define quasi-judicial power … we find it is the nature, quality, and purpose of the act performed, rather than the name or character of the officer or board [that] performs it, which determines its character as judicial. Generally, the judicial function consists of: (1) the presence of

the parties upon notice; (2) the ascertainment of facts; (3) the determination of the issues; and, (4) the rendition of a judgment or final order regarding the parties' rights, duties, or liabilities.

*Id.* at 721.

 Fundamental to the exercise of quasi-judicial authority is the protection of "due process to those whose rights will be affected by [the] actions." *Ennis v. Dep't of Local Gov't Fin.*, 835 N.E.2d 1119, 1122 (Ind. T.C.2005). "Due process contemplates notice and an opportunity to be heard ... [and] requires the opportunity to present rebuttal evidence." *City of Hobart Common Council v. Behavioral Inst. of Ind., LLC,* 785 N.E.2d 238, 251 (Ind.Ct. App.2003) (citations omitted). Regarding quasi-judicial proceedings of administrative bodies, our supreme court has stated:

> We acknowledge that the proceedings before administrative bodies are not required to be conducted with all of the procedural safeguards afforded by judicial proceedings, even when such proceedings are judicial in nature. We accept a lower standard in proceedings before quasi-judicial bodies because it would be unworkable to do otherwise. There are, nevertheless, standards below which we should not go. *These standards, logically, should be at the highest level that is workable under the circumstances.* "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut* (1971), 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113[.]

*City of Mishawaka v. Stewart,* 261 Ind. 670, 675, 310 N.E.2d 65, 68 (1974) (emphasis added).

 As an initial matter, the "nature, quality, and purpose" of the antiharassment proceeding indicates a quasi-judicial

nature. *Lincoln,* 510 N.E.2d at 721. The purpose of the antiharassment proceeding is to "encourage faculty, staff, and students to report and address incidents of harassment." Appellants' App. at 348. Additionally, each of the four factors specified in *Lincoln* as comprising the judicial function was present in the antiharassment proceeding. Keri does not dispute that he was given notice of the Purdue complaints, along with copies of the complaints and the identities of the complainants, in a reasonable time. Blakemore specifically identified four issues relevant to Swinehart's complaint and ten issues relevant to Hartman's. After doing so, Blakemore ascertained relevant facts by interviewing the complainants, Keri, members of the faculty, and thirteen students from four different academic years. Blakemore stated that she identified those thirteen students in three ways:

> Some of them were asked by the complainants to call me; Dr. Burg [Assistant Professor in Education at IPFW] suggested to some of them that they call me; and I approached some of them directly. The names of the students I approached directly were given to me by Dr. Keri, Dr. Burg, and/or Dr. Utesch.

*Id.* at 361. It is not disputed that a final judgment in the antiharassment proceeding would affect the parties' rights, duties, or liabilities.

Further, Purdue's antiharassment proceeding satisfied the procedural protections required in its exercise of the judicial function. Keri contends, however, that Purdue failed to provide adequate procedural protections in the antiharassment proceeding. Specifically, Keri maintains that that proceeding cannot be quasi-judicial because: (1) he was not allowed representation by counsel; (2) Blakemore was unable to remain impartial during the investigation; (3) the proceeding was not

limited to a single body; (4) Blakemore lacked subpoena power; and (5) judicial review of the proceeding was unavailable to Keri. We cannot agree.

As Keri's arguments emphasize, the standards identified in *Lincoln* are not per se determinative of a proceeding's quasi-judicial nature. Rather, in addition to those standards, Purdue's Procedures "should be at the highest level that is workable under the circumstances." *City of Mishawaka*, 261 Ind. at 675, 310 N.E.2d at 68. Aside from the procedural safeguards incorporated above, Purdue's Procedures require the following: an opportunity for the respondent to answer in writing; an exclusion of stale claims, defined as claims 120 days or older; the appointment of an impartial third party to investigate the complaints by interviewing witnesses and reviewing documents; determination of the validity of the complaints under a "preponderance of the evidence" standard; an initial appeal of the investigator's conclusions to an impartial three member panel, consisting of at least one faculty member and at least one non-faculty member, together with either the Chancellor or the Vice President for Human Relations; an opportunity for the respondent to meet with the panel and the Chancellor or Vice President for Human Relations; and an opportunity for a second appeal to the President of the University. In addition, Purdue's Procedures specifically require investigation into and protection from knowingly false or malicious charges.

Keri's arguments that Purdue has not provided adequate procedures are unpersuasive. First, regarding Keri's argument that he was not permitted to have legal

counsel and that Blakemore lacked subpoena power, Keri provides no authority to support his position that such requirements are necessary for adequate process in a quasi-judicial setting. Rather, "[w]e accept a lower standard in proceedings before quasi-judicial bodies because it would be unworkable to do otherwise." Id. Further, we will not "attempt to convert [an administrative board] into a little court." *State ex rel. Paynter v. Marion County Superior Court*, 264 Ind. 345, 352, 344 N.E.2d 846, 851 (1976). This principle is especially true in the educational environment. See *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) ("We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship.").[3] We cannot say that those restrictions were improper in this context.

Keri further argues that Blakemore was unable to remain impartial in her role as investigator. However, Keri does not present evidence in support of his position. Rather, he argues that Blakemore's lack of impartiality is demonstrated by her expression of "utmost respect" toward Swinehart and Hartman "for their courage in coming forward with their complaints." Appellee's Brief at 14. However, the larger context of those words demonstrates that they were based not on a bias, but out of a concern that the evidence demonstrated that students generally were afraid to come forward with such complaints. As quoted above, Blakemore stated:

> Finally, I would like to express my utmost respect toward [Swinehart] and [Hartman] for their courage coming for-

---

**3.** The dissent, it seems, ignores this principle—and the standards announced by our supreme court in *City of Mishawaka* and this Court in *Lincoln*—by arguing that the antihar-

assment proceedings must permit legal counsel, cross-examination, and legal penalties, such as perjury, in order for an absolute privilege to apply.

ward with their complaints. I spoke to several other students who believed that they had been harmed by [Keri], but were afraid to speak, lest their future careers be harmed. I spoke to former students who said that they had wanted to report their concerns about his behavior once they left the university, but they never had, and that they felt distressed and guilty that they had not. Hence the university should applaud those who are willing to come forward with a serious complaint at possible risk to themselves, particularly when they are taking the risk partly for the good of others.

Appellants' App. at 150–51. Thus, Blakemore's comments do not demonstrate a lack of impartiality. To the extent Keri argues that Blakemore's bias was demonstrated by her consideration of evidence only cited by Swinehart and Hartman, Keri provides no evidentiary support for such an argument. Indeed, the record reflects that Blakemore considered evidence from a number of sources, including Keri.

Finally, in regard to Keri's arguments that the antiharassment proceeding was limited to a single body and he was not afforded judicial review, such arguments are not well-founded. Blakemore's investigation was reviewed by a three-member panel with either the Vice President for Human Relations or the Chancellor. Keri also had the option to appeal from that panel's decision to the President of the University, which he did. And Keri's bald assertion that he could not seek judicial review of the antiharassment proceeding is unpersuasive. If Purdue's final decision from the antiharassment proceeding were contrary to law, then he would be able to seek a legal or equitable remedy in the courts. However, we decline to address whether he would be entitled judicial review of particular issues absent a more

specific allegation. Thus, we hold that the antiharassment proceeding was an exercise of the judicial function with the highest level of procedural safeguards workable under the circumstances.

## Absolute Privilege

▆ The function of the quasi-judicial antiharassment proceeding demonstrates the need for an absolute privilege. Again, in determining whether a person is entitled to an absolute judicial privilege, we look to the nature of the function performed and not the identity of the actor who performed it. *H.B.*, 713 N.E.2d at 302. Here, the antiharassment proceeding sought to investigate claims of "harassment in the workplace or the educational environment," Appellants' App. at 346, by Purdue employees so that Purdue could take preventive and corrective measures. To be effective, such proceedings require complainants to be free from the prospect of retaliatory litigation for defamation. The absence of an absolute privilege would eviscerate the function of those proceedings and denigrate the integrity of the judicial function those proceedings serve. The grant of a qualified privilege is likewise insufficient in those settings because such privileges require a trier of fact to determine whether the privilege has been abused. *See Chapman*, 482 N.E.2d at 479–80.

As the instant case demonstrates, if a single unfavorable grade is sufficient to overcome summary judgment it would take an extremely diligent student to avoid litigating that issue before a trier of fact, thereby avoiding litigation. That threat of litigation would have a chilling effect on the willingness of students to come forth with complaints of harassment or hostile environments, which in turn would prevent universities from being able to remedy such situations. The instant case is direct-

ly analogous to the grant of absolute privilege in the traditional judicial forum. Hence, Swinehart and Hartman's allegedly defamatory communications made as a part of the antiharassment proceeding are protected by an absolute privilege.

Swinehart and Hartman assert that our conclusions are in accord with similar cases from other jurisdictions. Specifically, Swinehart and Hartman cite cases from California, Maryland, and New York in support of the dual proposition that the antiharassment proceeding is quasi-judicial and, as such, that the Purdue complaints are entitled to absolute privilege. *See Brody v. Montalbano*, 87 Cal.App.3d 725, 151 Cal.Rptr. 206 (1978); *Reichardt v. Flynn*, 374 Md. 361, 823 A.2d 566 (2003); *Weissman v. Mogol*, 118 Misc.2d 911, 462 N.Y.S.2d 383 (1983). We note that the California, Maryland, and New York cases each involved parental complaints to secondary school boards. However, each of those cases recognized, after analyzing the procedural protections those boards afforded the respondents, that the respective complainants were entitled to an absolute privilege.

■ Swinehart and Hartman also cite an unpublished case from the Minnesota Court of Appeals for support. And Keri argues that the instant case is analogous to an unpublished decision from the Northern District of Illinois. A not-for-publication decision shall not be regarded as precedent and shall not be cited except to establish res judicata, collateral estoppel, or law of the case. Ind. Appellate Rule 65(D). Hence, we will not consider the unpublished cases from Minnesota and Illinois.

Keri identifies no other jurisdictions supporting his position that an action for defamation should trump the need for antiharassment complaints filed in quasi-judicial forums to be free from the fear of retaliatory litigation. Nor does Keri argue

that an absolute privilege is barred on the grounds that the Purdue complaints were irrelevant or not pertinent to the antiharassment proceeding. Thus, we hold that an absolute privilege is essential to protect the integrity of the judicial functions embodied by the antiharassment proceeding. As such, Keri cannot maintain an action for defamation against Swinehart and Hartman based on the Purdue complaints, and Swinehart and Hartman are entitled to summary judgment.

Reversed.

FRIEDLANDER, J., concurs.

DARDEN, J., dissents with separate opinion.

DARDEN, Judge, dissenting.

I respectfully dissent to the majority's conclusion that absolute privilege applies here.

First, I would find that the statements by Hartman and Swinehart are only entitled to possible protection as *qualified* privilege. I do not believe the proceedings provided by Purdue rise to the level of "judicial process" because they lack the inherent protections of the judicial process. The Procedures themselves state that they "are not those of a court of law, and the presence of legal counsel for the parties is not permitted during the conduct of these Procedures." (App. 353). Without representation by counsel, the Procedures do not provide for cross-examination of adverse witness statements. Also, the adverse statements made in the course of the Procedures are not made under oath, subject to the penalties of perjury. The majority also notes that the Procedures "specifically require investigation into and protection from knowingly false or malicious charges." Op. at 1029. However, the "remedy" provided by C–33 for bring-

ing a false charge, or "a charge of harassment in bad faith," is disciplinary action by Purdue against the person who brought that charge—not a legal remedy for the person falsely charged. It is precisely because the Procedures fail to provide to Keri the inherent protections of the judicial process that I would find that the privileges here must be found to be qualified—thereby requiring "a trier of fact to determine whether the privilege has been abused." Op. at 1030.

Further, I would find that there is a material question of fact as to whether Hartman and Swinehart abused that privilege. A communication may be protected by "qualified privilege if a need exists for full and unrestricted communication regarding matters on which the parties have a common interest or duty." *Olsson v. Indiana Univ. Bd. of Trs.,* 571 N.E.2d 585, 587 (Ind.Ct.App.1991), *trans. denied.* It seems clear to me that Purdue, its faculty, and it students have a common interest in the "report[ing] and address[ing] of incidents of harassment." (App. 348). Under the qualified privilege rule, a communication is privileged if made in good faith on any subject matter in which the party making the communication has an interest if made to a person having a corresponding duty. *Id.* However, as cited by the majority, the protection of the qualified privilege applies to communication "made in good faith." *Ind. Nat'l Bank v. Chapman,* 482 N.E.2d 474, 479 (Ind.Ct.App. 1985), *trans. denied.* Thus, application of the privilege "does not change the actionable quality of the words published" because the trier of fact may still "determine the privilege was abused by ... lack of belief or grounds for belief in the truth of what is said." *Id.* at 479, 480.

I find that whether statements made by Hartman and Swinehart in the course of reporting and addressing allegations of harassment were made in "good faith" is a question of fact. The Procedure's specific omissions of protection for Keri that would be provided by the judicial process—representation by counsel, testimony under oath, cross-examination, a legal remedy—lead me to conclude that the statements made therein should be subject to and tested by the crucible of trial. The credibility of those who made the adverse statements, Hartman and Swinehart, should be put to that test. Therefore, I would affirm the trial court.