ATTORNEY FOR APPELLANTS
Karen R. Orr
Lafayette, Indiana

AMICI CURIAE BOARDS OF TRUSTEES
OF BALL STATE UNIVERSITY, INDIANA
STATE UNIVERSITY, INDIANA UNIVERSITY,
AND PURDUE UNIVERSITY
Scott E. Shockley
James R. Williams
Muncie, Indiana

ATTORNEY FOR APPELLEE
Swaray E. Conteh
Indianapolis, Indiana



**FILED**
Apr 01 2008, 10:26 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 02S03-0706-CV-233

VIRGINIA HARTMAN AND
SUZANNE SWINEHART,

*Appellants (Defendants below),*

v.

DR. GABE KERI,

*Appellee (Plaintiff below).*

Appeal from the Allen Superior Court, No. 02D01-0503-CT-129
The Honorable David J. Avery, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 02A03-0603-CV-135

**April 1, 2008**

**Boehm, Justice.**

We hold complaints made by a current student pursuant to a university anti-harassment policy are protected by an absolute privilege and cannot serve as the basis for civil liability to a person who is the subject of the complaint.

**Facts and Procedural History**

Indiana University–Purdue University at Fort Wayne ("IPFW") is managed by Purdue University. In August 2000, Dr. Gabe Keri was appointed an Assistant Professor of Education in the IPFW School of Education. Keri initially served under a one-year contract which was renewed annually in the succeeding three academic years. On April 3, 2003, Keri received notice that his contract would not be renewed for the 2004–2005 academic year because of unsatisfactory teaching performance.

Virginia Hartman and Suzanne Swinehart were graduate students in the School of Education during the 2002–2003 academic year. Both took courses in the Counselor Education Program from Keri and also worked as Graduate Aides. Apparently without knowledge of the administration's action, on May 12, 2003, Hartman and Swinehart filed formal complaints with Purdue's Affirmative Action Office at IPFW alleging sexual harassment by Keri. The students' complaints were filed pursuant to Purdue's antiharassment policy and procedures, designed "to prevent harassment within the Purdue University Community." Although the procedures expressly state they are "not those of a court of law," they do contain many familiar elements. Complaints must be filed within 120 days of the incident. The respondent must be notified of the complaint and permitted to respond. An investigator is to conduct a "thorough fact-finding investigation," including interviewing the complainant, the respondent, and pertinent witnesses. The parties are given an opportunity to appeal the investigator's determination to the President of Purdue. The policy "encourage[s] faculty, staff, and students to report and address incidents of harassment" but also provides that "appropriate discipline will result" in the event of "knowingly false or malicious charges." If a charge is not substantiated by the investigation, "reasonable efforts will be taken to restore the reputation of the Respondent."

Upon receipt of Hartman's and Swinehart's complaints, IPFW initiated an investigation. Keri was notified of the complaints on May 20, 2003, and responded by requesting that they be dismissed without further action. Chancellor Michael Wartell advised Keri that he could not dismiss complaints without investigation, and that Dr. Elaine Blakemore, Chair of the Department of Psychology, had been assigned to investigate.

Blakemore interviewed Keri, Hartman, Swinehart, Keri's supervisor, some of Keri's colleagues, and thirteen current and former students in the Counselor Education Program. She then submitted a written report on June 30, 2003, concluding that "[o]n balance . . . the majority of students . . . provided examples of experiences that were consistent with Ms. Hartman's and Ms. Swinehart's complaints." Blakemore found that Keri "created a hostile educational environment for students in the Counselor Education Program" and had harassed Hartman. As to Swinehart's complaint, "[l]argely because her complaints were not reported in the appropriate time frame," Blakemore could not find that Swinehart was also "specifically harassed under the Purdue policy." She described Hartman and Swinehart as "credible and genuinely anguished about their experiences" and commended them for taking action:

> Finally, I would like to express my utmost respect toward Ms. Swinehart and Ms. Hartman for their courage in coming forward with their complaints. I spoke to several students who believed that they had been harmed by Dr. Keri, but who were afraid to speak, lest their future careers be harmed. I spoke to former students who said that they had wanted to report their concerns about his behavior once they left the university, but they never had, and that they felt distressed and guilty that they had not. Hence, the university should applaud those who are willing to come forward with a serious complaint at possible risk to themselves, particularly when they are taking that risk partly for the good of others.

Blakemore recommended that Keri "be immediately removed from his teaching and practicum supervision responsibilities, and from any supervisory contact with students in the School of Education."

Blakemore's findings and conclusions were reviewed and approved by a three-person panel and by Chancellor Wartell, the senior executive officer at the Fort Wayne campus. Keri was notified that he would be assigned to a "100% research" position for the upcoming year and would not be permitted to use his university office. Keri appealed the determination to the President of Purdue University, who upheld Chancellor Wartell's decision.

After his contract expired, Keri sued Purdue University in the Northern District of Indiana. Keri alleged state tort claims and violations of the Civil Rights Act of 1964, including a claim that Hartman, Swinehart, and Keri's supervisor had "conspired to smear [Keri's] reputation" through false allegations of sexual harassment and ineffective teaching. The district court granted summary judgment in favor of Purdue on these claims, Keri v. Board of Trustees of Pur-

3

due University, No. 1:04-CV-224-TS, 2005 WL 4715211, at *26 (N.D. Ind. Nov. 9, 2005) (un-published), and the Seventh Circuit affirmed. Keri v. Bd. of Trs. of Purdue Univ., 458 F.3d 620 (7th Cir. 2006), cert. denied, 127 S. Ct. 1331 (2007).

While the federal complaint against Purdue was pending in the district court, Keri filed this lawsuit in the Allen Superior Court against Hartman and Swinehart alleging libel, slander, and malicious interference with Keri's employment contract. Hartman and Swinehart moved for summary judgment on several grounds, including that the statements in their complaints made pursuant to the Purdue policy were protected by an absolute privilege. The trial court granted summary judgment on the malicious interference count on the basis that the decision not to re-new Keri's contract was made before Hartman and Swinehart filed their complaints. The trial court denied summary judgment on the libel and slander claims, concluding that the students' complaints enjoyed only a qualified privilege which turned on unresolved issues of fact.

Hartman and Swinehart were granted leave to file an interlocutory appeal and the Court of Appeals reversed the trial court, holding that Hartman's and Swinehart's statements were pro-tected by an absolute privilege. Hartman v. Keri, 858 N.E.2d 1017, 1020 (Ind. Ct. App. 2006), reh'g denied. We granted transfer to address this issue of first impression in Indiana. Hartman v. Keri, 869 N.E.2d 461 (Ind. 2007). For the reasons given below, we agree with the Court of Appeals that the students' complaints are protected by an absolute privilege.

## Standard of Review

On appeal from an order denying summary judgment, we use the same standard of re-view used by the trial court: summary judgment is appropriate only when the evidence shows no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Row v. Holt, 864 N.E.2d 1011, 1013 (Ind. 2007). All inferences from the designated evidence are drawn in favor of the nonmoving party. Id.

## Absolute Privilege

Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the state-ments. Wilkins v. Hyde, 41 N.E. 536, 536, 142 Ind. 260, 261 (1895); Van Eaton v. Fink, 697

4

N.E.2d 490, 494 (Ind. Ct. App. 1998). "The reason upon which the rule is founded is the necessity of preserving the due administration of justice," Wilkins, 41 N.E. at 536, 142 Ind. at 261, by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims. Van Eaton, 697 N.E.2d at 494 (citing Briggs v. Clinton County Bank & Trust Co., 452 N.E.2d 989, 997 (Ind. Ct. App. 1983)).

Policies similar to Purdue's are commonly found in institutions of higher education.[1] At least three states have held that communications to school authorities raising complaints against educators enjoy the same absolute privilege the law accords to statements in judicial proceedings. Reichardt v. Flynn, 823 A.2d 566 (Md. 2003) (parents' complaints of sexual harassment by high school coach to principal and public school officials); Brody v. Montalbano, 87 Cal. App. 3d 725 (Cal. Ct. App. 1978) (parents' complaints against junior high school teacher to board of education); Weissman v. Mogul, 462 N.Y.S.2d 383 (N.Y. Sup. Ct. 1983) (parents' complaints against high school teacher to board of education). In reaching this conclusion courts have described the processes of the educational institutions as quasi-judicial. Reichardt, 823 A.2d at 570, 574; Weissmann, 462 N.Y.S.2d at 386. This view of the issue, adopted by Justice Rucker's separate opinion, invokes a body of law that analyzes the availability of the privilege in terms of the degree to which court-like procedures are available. Thus, courts have examined whether proceedings are under oath, whether there is subpoena power, whether discovery is available, and the like. Reichardt, 823 A.2d at 574; Weissmann, 462 N.Y.S.2d at 386–87. Purdue's processes do not establish such a formal apparatus. But to the extent Keri has a complaint about the adequacy or fullness of the process, it is a complaint with Purdue, not Hartman and Swinehart. That complaint has been asserted in federal court and has been resolved there adversely to Keri. At least in the context of educational institutions, as long as the process is reasonably transparent and fair and affords the subject an opportunity to respond, we think the ultimate issue focuses less on the particular process and more on the recognition of the institution's interest in assuring a proper educational environment.

Hartman and Swinehart acted under the procedure Purdue established. Protecting their complaints with anything less than an absolute privilege could chill some legitimate complaints

---

[1] The Boards of Trustees of Ball State University, Indiana State University, Indiana University, and Purdue University as amici curiae provided helpful briefs in the Court of Appeals and on transfer.

for fear of retaliatory litigation. Other faculty-student disputes would result in traditional litigation rather than academic resolution to avoid any risk of loss of the absolute privilege accorded statements in judicial proceedings. A university should be given the latitude to tailor its processes to the educational environment without degrading the protection the law gives to complaints of misconduct in the educational setting. The facts of this case illustrate the importance of such a procedure. Many, though not all, of Hartman's and Swinehart's allegations center around classroom activities. They complain of excessive class discussion of matters pertaining to sexuality, insufficient supervision of the counseling practicum, and "disrespectful or hostile treatment" of students in class. The university is the best judge of whether these classroom activities are a legitimate teaching method or constitute discrimination, harassment, or the establishment of a hostile environment. Cf. S. Gibson Sch. Bd. v. Sollman, 768 N.E.2d 437, 442 (Ind. 2002) (upholding expulsion of high school student under zero-tolerance drug policy and noting that "[s]chool officials, with their expertise in such matters, are in the best position to determine in their discretion what actions are reasonably necessary to carry out school purposes") (citations omitted).

Citizens reporting suspected criminal activity to law enforcement enjoy only a qualified privilege, which subjects them to the risk of retaliatory civil litigation for malicious or unfounded charges. E.g., Holcomb v. Walter's Dimmick Petrol., Inc. 858 N.E.2d 103, 106 (Ind. 2006) (citing Conn v. Paul Harris Stores, Inc., 439 N.E.2d 195, 200 (Ind. Ct. App. 1982)). At first blush it may seem anomalous to grant a higher degree of protection to complaints made in the educational setting. But a current student is subject to academic discipline for abuse of the process. In practical terms this is a substantial deterrent to false reporting. Moreover, the need for protection is greater in the educational setting because the subject of the complaint—the educator—is in a position of authority over the student, so fear of retaliation presents a potential obstacle to open airing of grievances. For all these reasons, there is both a diminished need to deter false reporting and a greater need to encourage reporting than exists outside the educational environment.

Finally, we think it is relevant that the Indiana General Assembly has given state higher educational institutions the power to govern conduct on institution property and to "prevent unlawful or objectionable acts," of the institution's students, faculty, and employees "wherever the conduct might occur." Ind. Code Ann. §§ 21-39-2-2 to -3 (West 2008). This includes the

6

power to "dismiss, suspend, or otherwise punish any student, faculty member, or employee of the state educational institution who violates the institution's rules or standards of conduct, after determination of guilt by lawful proceedings." Id. § 21-39-2-4(b). These statutes authorize educational institutions to construct their own disciplinary procedures in a way that protects the needs of the participants and also serves the educational goals of the institution. Although Purdue's procedure may lack the trappings of a traditional court proceeding, it is orderly and reasonably fair, requires "appropriate discipline" for those who file knowingly false or malicious complaints, and promises reasonable efforts to restore the reputation of anyone charged with discrimination or harassment that proves unsubstantiated. If Keri has been unfairly treated, his complaint is against Purdue University as the architect and implementer of the policy and procedures, not the students who invoked the process.

**Conclusion**

This case is remanded to the trial court with instructions to grant the defendants' motion for summary judgment.

Shepard, C.J., and Dickson and Sullivan, JJ., concur.
Rucker, J., concurs in result with separate opinion.

7

**RUCKER, Justice, concurring in result.**

I concur in the result reached by the majority. I write separately to explore a point of departure.

Public policy considerations require that certain defamatory communications be cloaked with an immunity, denominated as an "absolute privilege." Such communications cannot form the basis for a cause of action. Rather, an absolute privilege bars an action for defamation even when the information was false and maliciously and knowingly published. Hoffman v. Roberto, 578 N.E.2d 701, 710 (Ind. Ct. App. 1991). Other communications receive a lesser degree of protection, known as a "qualified privilege." This latter privilege protects communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he or she has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty. Schrader v. Eli Lilly & Co., 639 N.E.2d 258, 262 (Ind. 1994).

Whether a defamatory communication is protected by either an absolute or a qualified privilege requires weighing the need for free disclosure without fear of civil suit against an individual's right to recover for such factors as damage to his reputation or his means of earning a livelihood. Weissman v. Mogol, 462 N.Y.S.2d 383, 385-86 (N.Y. Sup. Ct. 1983). In resolving these competing interests, the protection of an absolute privilege has been afforded to defamatory statements made during the course of judicial proceedings.[1] And that is so because "[p]ublic interest in the freedom of expression by participants in judicial proceedings, uninhibited by the risk of resultant suits for defamation, is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged." Van Eaton v. Fink, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998) (citation omitted). For the same reason, an absolute privilege has been extended to communications made in the course of proceedings, which may be characterized as quasi-judicial, including certain

---

[1] At least one treatise notes only six areas in which courts have recognized an absolute privilege: (1) "Judicial proceedings;" (2) "Legislative proceedings;" (3) "Executive communications;" (4) "Consent of the plaintiff;" (5) "Husband and wife;" and (6) "Political broadcasts." W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 114, at 816-24 (5th ed. 1984).

administrative proceedings. See, e.g., Keeton, supra § 114, at 818-19. "Absolute immunity has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." Id. at 816.

A central question presented by this case is what is it about the university's procedure for addressing complaints of harassment that makes the procedure quasi-judicial in nature. Although acknowledging that the university's processes lack a certain formality sometimes associated with quasi-judicial proceedings, the majority does not really answer this question. Instead it says, "[T]o the extent Keri has a complaint about the adequacy or fullness of the process, it is a complaint with Purdue, not Hartman and Swinehart." Slip op. at 5. I cannot fully subscribe to this view. It is of course the case that Keri may have a separate cause of action against the university concerning its anti-harassment policy and procedure. But that is a wholly separate matter from an inquiry into whether the alleged defamatory communication the students made to the university is entitled to an absolute privilege or only a qualified privilege. That determination is dependent on whether the proceeding under which the university operated was indeed quasi-judicial. Only if the proceeding was quasi-judicial is the communication absolutely privileged and thus cannot form the basis for a cause of action.

Keri complains that the procedure under which Purdue acted did not allow counsel to appear and cross-examine witnesses or provide an opportunity to subpoena witnesses. According to Keri the "proceeding is ostensibly non-judicial. There was no formal hearing during the fact finding process. The process was non-adversarial." Pet. to Trans. at 8. In essence Keri's argument is that these safeguards are part and parcel of what it means for a body to act in a quasi-judicial capacity.

My research reveals no ironclad rule for determining what factors indicate that a body is serving in a quasi-judicial capacity. As Keeton notes,

> The judicial proceeding to which [absolute] immunity attaches has not been defined very exactly. It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes, for example, lunacy, bankruptcy, or naturalization proceedings, and an election

2

> contest.  It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial, or quasi-judicial, in character.

Keeton, supra, § 114 at 818-19 (citations and internal quotations omitted).

In some jurisdictions the application of the absolute privilege in administrative proceedings turns in large part on only two factors: "(1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." Reichardt v. Flynn, 823 A.2d 566, 571 (Md. 2003).  See also, Fisher v. Lint, 868 N.E.2d 161, 168 (Mass. App. Ct. 2007).  In other jurisdictions courts have identified at least six factors that assist in determining whether a proceeding is quasi-judicial in nature.  Among them are whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and make decisions; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of issues on a hearing; or (6) enforce decisions or impose penalties.  See, e.g., Thomas v. Petrulis, 465 N.E.2d 1059 1062 (Ill. App. Ct. 1984); Gallegos v. Escalon, 993 S.W.2d 422, 425 (Tex. App. 1999).

This latter view is consistent with where this jurisdiction appears to come out on the subject of whether a body is acting in a quasi-judicial capacity.

> While it is difficult, if not impossible, to define quasi-judicial power and to discriminate between judicial and administrative acts in a way which will be applicable to every case, we find it is the nature, quality, and purpose of the act performed, rather than the name or character of the officer or board which performs it, which determines its character as judicial.  Generally, the judicial function consists of: (1) the presence of the parties upon notice; (2) the ascertainment of facts; (3) the determination of the issues; and, (4) the rendition of a judgment or final order regarding the parties' rights, duties, or liabilities.

Lincoln v. Bd. of Comm'rs of Tippecanoe County, 510 N.E.2d 716, 721 (Ind. Ct. App. 1987) (footnote omitted), abrogated on other grounds by McDillon v. N. Ind. Pub. Serv. Co., 841

3

N.E.2d 1148, 1152 (Ind. 2006).  See also City of Mishawaka v. Stewart, 261 Ind. 670, 676, 310 N.E.2d 65, 68 (1974) (noting that the procedural safeguards in proceeding before quasi-judicial bodies "should be at the highest level that is workable under the circumstances").

Notably absent from these various formulations is any requirement that a party be (1) represented by counsel;[2] (2) allowed to subpoena witnesses on his own behalf; or (3) allowed to cross-examine adverse witnesses.  Although these certainly are critical features of the judicial process – indeed with constitutional implications – they are not necessarily features of a quasi-judicial proceeding.

In this case the facts are clear that the university's administrative procedure for addressing complaints of harassment is quasi-judicial in nature.  During the course of the proceedings the university had the authority to and did: (1) exercise judgment and discretion; (2) determine facts and make a decision; (3) make binding orders; (4) affect Keri's property rights; (5) examine witnesses; and (6) enforce its decision.  Accordingly the students' communications made pursuant to that procedure are entitled to an absolute privilege.

---

[2] Indeed in Lake Central Sch. Corp. v. Scartozzi, 759 N.E.2d 1185, 1191 (Ind. Ct. App. 2001), the Court of Appeals rejected a claim that a student's due process rights were violated where the school prohibited student from having his attorney present during an expulsion meeting.