

FILED
Sep 28 2020, 8:41 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James E. Ayers
Wernle Ristine & Ayers
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Rori L. Goldman
Brandais H. Hagerty
Elizabeth H. Knotts
Hill Knotts & Goldman
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Richard Jernagan,

*Appellant-Defendant,*

v.

Indiana University Health a/k/a
Indiana University Health ACO,
Inc.,

*Appellee-Plaintiff.*

September 28, 2020

Court of Appeals Case No.
20A-PL-41

Appeal from the Marion Superior
Court

The Honorable Patrick J. Dietrick,
Judge

Trial Court Cause No.
49D12-1507-PL-23961

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant/Cross-Appellee-Plaintiff, Richard Jernagan (Jernagan), appeals the trial court's summary judgment in favor of Appellee/Cross-Appellant-Defendant, Indiana University Health a/k/a Indiana University Health Aco, Inc. (IU Health), concluding that no genuine issue of material fact exists that the anesthesiologist assisting in the surgical procedure was an independent contractor and not an IU Health's employee.

We reverse.

# ISSUE

Jernagan presents this court with four issues, which we consolidate and restate as the following single issue: Whether the delivery of a business card during the surgical registration procedure is sufficient to satisfy the meaningful notice requirement informing the patient that the doctor performing the medical procedure is an independent contractor, as required under *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142 (Ind. 1999).

On Cross-Appeal, IU Health presents one issue, which we restate as: Whether Jernagan's response to IU Health's motion for summary judgment should be stricken as untimely.

# FACTS AND PROCEDURAL HISTORY

On March 8, 2011, Jernagan underwent spine surgery performed by Stephen M. Ritter, M.D. (Dr. Ritter), at the IU Health North campus. The

anesthesiology during the surgery was scheduled to be done by Michael Miller, M.D. (Dr. Miller), who was a partner with Anesthesia Consultants of Indianapolis. Jernagan was considered a high-risk surgical patient because of several underlying health issues.

[6] On the day of his surgery, Jernagan presented at guest services for registration. Mary Mosby (Mosby), IU Health's guest relations representative, registered Jernagan and handed him Dr. Miller's business card, which stated Dr. Miller's name, employer, and contact information, and whom Mosby identified as the anesthesiologist assisting Dr. Ritter with the surgical procedure. Mosby did not advise Jernagan that Dr. Miller was an independent contractor and not an employee of IU Health. Prior to the surgery, Jernagan met briefly with Dr. Miller who explained the procedure. During the surgery, Jernagan experienced a sudden drop in blood pressure from excessive blood loss, causing a cardiac arrest. Jernagan required cardiac resuscitation and was admitted to the intensive care unit following resuscitation. Immediately post-surgery, Dr. Miller met with Jernagan's family and answered their questions about the procedure. Three weeks after the surgery, Jernagan's grandson emailed Dr. Miller with the request to contact Jernagan's wife to discuss further what had happened during the surgical procedure. On April 21, 2011, Jernagan's spouse contacted Dr. Miller directly with questions about her husband's surgery. Dr. Miller called Jernagan's wife and answered questions about her husband's prognosis.

On March 4, 2013, Jernagan submitted his proposed Complaint to the Indiana Department of Insurance alleging medical malpractice by Dr. Ritter and IU Health. Although Jernagan named an anesthesiologist in his proposed Complaint, he submitted an incorrect name. On April 20, 2015, the convened medical review panel issued an opinion favoring Dr. Ritter and IU Health, concluding that, "[t]he evidence does not support the conclusion that any of the Defendants failed to comply with the appropriate standard of care as charged in the Complaint." (Appellant's App. Vol. II, pp. 38-43). The panel did not address the conduct of the incorrectly named anesthesiologist or any other anesthesiologist.

On July 17, 2015, Jernagan filed his Complaint against Dr. Ritter and IU Health, alleging that the hospital staff "failed to monitor the amount of blood being lost" by Jernagan. (Appellant's App. Vol. II, p. 20). With respect to IU Health, Jernagan claimed specifically that the nurses failed to properly monitor and document the amount of blood lost during the surgery, they failed to notify Dr. Ritter of this amount, and they placed a canister of blood in a location that was not visible to Dr. Ritter. On September 30, 2015, the trial court dismissed Dr. Ritter at Jernagan's request. Also on that same day, IU Health filed a motion for summary judgment and designation of evidence. In response to IU Health's motion, Jernagan offered the affidavit of Stephen Paschall, M.D. (Dr. Paschall), an emergency medicine physician. On January 11, 2016, the trial court conducted a hearing on IU Health's motion for summary judgment. At the hearing, Jernagan contended that IU Health was vicariously liable for the

acts of Dr. Miller on the theory of apparent agency and pursuant to *Sword* and its progeny. *See Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142 (Ind. 1999). On March 16, 2016, the trial court denied summary judgment.

[9] Additional evidence was developed, and more discovery occurred prior to IU Health filing a second motion for summary judgment on January 15, 2019, asserting that *Sword* precluded its liability. Jernagan requested and was granted two enlargements of time until April 7, 2019. On March 15, 2019, IU Health filed a joint motion for continuance of trial, which was granted by the trial court with the matter set for a telephonic scheduling conference on March 22, 2019. During the scheduling conference, the trial court's bailiff consulted with both counsel to set a new trial date. Immediately prior to the conference, the attorneys for the parties had conferred and agreed to extend Jernagan's response deadline to May 8, 2019. The parties informed the bailiff during the scheduling conference of their verbal agreement and Jernagan's intent to seek an extension of time. A jacket entry on the Chronological Case Summary (CCS) was created that same day, which stated:

> Parties by counsel. Parties have stipulated to extending deadline on response to the pending [m]otion for [s]ummary [j]udgment to May 8, 2019. The [c]ourt has scheduled hearing on the pending [m]otion for [s]ummary [j]udgment on May 21, 2019 at 11:00 a.m. The [c]ourt also schedules the [f]inal [p]re-[t]rial [c]onference on February 24, 2020 at 11 a.m. and the [j]ury [t]rial to begin on March 17, 2020 at 9:00 a.m. Defendant's [c]ounsel will circulate an order on the [s]ummary [j]udgment [d]eadline and [t]rial [d]ate to submit to the [c]ourt. SEND NOTICE.

(Appellee's App. Vol. II, p. 23). On April 9, 2019, IU Health's counsel emailed Jernagan's counsel reminding him that he needed to file a motion requesting a formal order to extend the deadline to submit his response to IU Health's motion for summary judgment. Jernagan did not file a motion to extend his April 7th, 2019 deadline. On May 8, 2019, Jernagan filed his response to IU Health's motion for summary judgment, as well as a designation of evidence which included affidavits by Dr. Paschall and Jernagan. IU Health moved to strike the response as untimely, which was denied by the trial court, finding:

> The CCS entry of March 22, 2019, documents the [c]ourt's [o]rder extending time to respond to the [m]otion for [s]ummary [j]udgment to May 8, 2019, as set out therein and that CCS entry reports the order. The directive to the Defendant to circulate the [o]rder was meant to separately express the [o]rder stated in the CCS entry. Plaintiff's response dated May 8, 2019 was timely.

(Appellee's App. Vol. II, p. 105).

[10]  On August 12, 2019, the trial court conducted a hearing on IU Health's motion for summary judgment. On September 27, 2019, the trial court granted summary judgment, concluding that "by providing [Jernagan] with Dr. Miller's business card at check-in prior to surgery, [IU Health] sufficiently notified [Jernagan] that it was not the provider of anesthesia care" and therefore IU Health was not vicariously liable pursuant to *Sword*. (Appellant's App. Vol. II, p. 186). With respect to Jernagan's claim related to the nursing staff, the trial court concluded that IU health was entitled to summary judgment because Jernagan had "failed to identify any expert to testify that IU Health, through

the actions or conduct of its nursing staff, breached the applicable standard of care."  (Appellant's App. Vol. II, p. 187).

Jernagan now appeals.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## CROSS-APPEAL

As IU Health presents us with a threshold procedural issue in its Cross-Appeal, we will address this claim first.  IU Health contends that the trial court abused its discretion when it denied IU Health's motion to strike Jernagan's response to its motion for summary judgment as untimely.  IU Health maintains that Jernagan's failure to seek and be granted a formal extension of his deadline to file a response by the trial court is fatal to his submission as the CCS entry was not an order, nor did it memorialize an order granting Jernagan an extension of time.

Indiana Trial Rule 56(C) provides that a party opposing a motion for summary judgment has thirty days after service of the motion to serve a response and any opposing affidavits.  Trial courts are authorized to "alter any time limit set forth in this rule *upon motion made by the applicable time limit*," if cause is found.  T.R. 56(I).  Our supreme court has explained that the following "bright line rule" applies to this situation:  "[W]here a nonmoving party fails to respond within thirty days by either (1) filing affidavits showing issues of material fact, (2) filing his own affidavit under Rule 56(F) indicating why the facts necessary to justify his opposition are unavailable, or (3) requesting an extension of time in which

to file his response under 56(I), the trial court lacks discretion to permit that party to thereafter file a response. In other words, "*a trial court may exercise discretion and alter time limits under 56(I) only if the nonmoving party has responded or sought an extension within thirty days filed for summary judgment.*" *HomEq Servicing Corp. v. Baker*, 883 N.E.2d 95, 98 (Ind. 2008) (*quoting Desai v. Croy*, 805 N.E.2d 844, 849 (Ind. Ct. App. 2004) (emphasis in original)).

[14] In *Booher v. Sheeram, LLC*, 937 N.E.2d 392, 394 (Ind. Ct. App. 2010), the Boohers twice sought and received extensions to respond to Hampton Inn's summary judgment motion. When their second extension was about to expire, they contacted Hampton Inn to explain that they needed three more weeks. *Id*. Hampton Inn indicated that it would not oppose a third extension of time. *Id*. The Boohers, however, failed to file a request with the trial court for a third extension before their deadline passed. *Id*. Relying on the bright line rule set forth by our supreme court in *HomEq Servicing Corp*, this court concluded that the trial court was without discretion to accept the late-filed documents. *Id*. at 395.

[15] Although Jernagan was granted two extensions like Booher, when Jernagan needed a third extension collegiality and cooperation between the parties prompted a CCS entry indicating that the "[p]arties have stipulated to extending deadline on response to the pending [m]otion for [s]ummary [j]udgment to May 8, 2019," with "Defendant's [c]ounsel [] circulat[ing] an order on the [s]ummary [j]udgment [d]eadline and [t]rial [d]ate to submit to the [c]ourt." (Appellee's App. Vol. II, p. 23). In *City of Indianapolis v. Hicks*, 932

N.E.2d 227 (Ind. Ct. App. 2010), we analyzed a CCS entry in the confines of a challenge to a *nunc pro tunc* order granting a motion to correct error. The *nunc pro tunc* order granting a motion to correct error was signed by the magistrate on the line titled "Judge." *Id*. at 229. A CCS entry of the same date stated, "Court approves granting Plaintiff's motion to correct error and denying Defendant's City of Indianapolis, motion to dismiss." *Id*. Another separate CCS entry of the same date stated, "Jacket entry: Plaintiff's motion to correct error granted. See entry. Reinstate file to open." *Id*. Because there was no separate order by the judge approving the magistrate's decision, only the jacket entry and the CCS entries, the City challenged the ruling claiming that it had no legal effect as it was only signed by the magistrate. *Id*. at 229-30. After the City's challenge, the trial judge issued a *nunc pro tunc* order granting the motion to correct error, which was signed by both the magistrate and the trial judge. *Id*. at 230. On appeal, we observed that the purpose of a *nunc pro tunc* entry is to memorialize something previously done and we noted that for the trial court to properly use a *nunc pro tunc* order, there needs to be a written memorial showing that the trial judge had actually approved the magistrate's decision. *Id*. We found that the CCS entries indicated actions taken by the trial judge and its entries "presumably exist contemporaneously with the actions they described." *Id*. The court concluded, "[a]s nothing in the record specifically contradicts the trial court's . . . statements in the CCS that the court approved granting Hick's motion to correct error, we conclude these entries are sufficient written memorial that [the trial judge] timely approved [the magistrate's] recommendation." *Id*. at 233.

Although *Hicks* was premised on a *nunc pro tunc* order, its reasoning is persuasive and we reach a similar conclusion with respect to Indiana Trial Rule 56. Our supreme court's bright line rule enunciated in *HomEq Servicing Corp.* allows a party to "request an extension of time in which to file his response under 56(I)[.]" *HomEq Servicing Corp.*, 883 N.E.2d at 98. Without further specifying the appropriate format of the request, we note that a verbal request was made as memorialized in the CCS entry of March 22, 2019, indicating that "Parties have stipulated to extending deadline on response to the pending [m]otion for [s]ummary [j]udgment to May 8, 2019." (Appellee's App. Vol. II, p. 23). In the entry, "Defendant's [c]ounsel" was ordered to circulate an order including the new summary judgment deadline. (Appellee's App. Vol. II, p. 23). We agree with the trial court's analysis that "[t]he directive to the Defendant to circulate the [o]rder was meant to separately express the [o]rder stated in the CCS entry." (Appellee's App. Vol. II, p. 105). Accordingly, as Jernagan requested the trial court to extend his deadline to file his response to IU Health's motion for summary judgment pursuant to the directives of *HomEq Servicing Corp.*, which was granted by the trial court, we conclude that Jernagan's response was timely and will not be stricken. Any other result under these circumstances would elevate form over substance, which we decline to do.

## APPEAL

[17] Turning to the merits of the appeal, we will address whether Dr. Miller should be characterized as an independent contractor under the holding of *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142 (Ind. 1999).

## I. *Standard of Review*

[18] In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607.

[19] We observe that, in the present case, the trial court entered findings of fact and conclusions of law thereon in support of its judgment. Generally, special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48

(Ind. Ct. App. 2004). However, such findings offer a court valuable insight into the trial court's rationale and facilitate appellate review. *Id.*

## II. *The Sword Doctrine*

[20] Jernagan contends that the trial court erred by granting summary judgment to IU Health as there is a genuine issue of material fact whether the delivery of a business card during the surgical registration procedure is sufficient to satisfy the meaningful notice requirement informing the patient that the doctor performing the medical procedure is an independent contractor, pursuant to *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142 (Ind. 1999).

[21] As the role of the modern hospital has evolved, so has the reality of modern hospital care. Hospitals have become big business, competing with each other for health care dollars, and engaging in expensive advertising campaigns to persuade potential patients to seek treatment at a specific hospital. Patients are generally unaware of the status of the various medical professionals working there, and it would be natural and logical to assume that these professionals are employees of the hospital. However, hospitals not only employ physicians, surgeons, nurses, and other health care workers, they also appoint physicians and surgeons to their hospital staff as independent contractors. As such, the realities of modern hospital care raise a serious question regarding the responsibility of a hospital when a physician who is an independent contractor renders presumed negligent health care.

[22]    Our supreme court first addressed this issue twenty years ago in its seminal decision in *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142 (Ind. 1999). In *Sword*, the plaintiff was in labor at the hospital and although she had previously decided on pain relief via epidural injection she did not know who would administer it. *Id.* at 145. During labor, an anesthesiologist discussed the epidural but was called out of the room prior to commencing the procedure. *Id.* A second anesthesiologist administered the epidural. *Id.* In the months following the birth of her child, Sword began experiencing symptoms she alleged were due to the negligent placement of the epidural. *Id.* Sword sought to hold the hospital vicariously liable for the independent contractor anesthesiologist's negligent placement of the epidural. *Id.* Our supreme court commenced its analysis by noting that "[v]icarious liability is indirect legal responsibility." *Id.* at 147. "It is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer." *Id.* Turning to the hospital setting, the *Sword* court mentioned that "Indiana courts have long followed the general rule that hospitals could not be held liable for the negligent actions of independent contractor physicians. [] [B]ecause hospitals are corporations and corporations could not legally practice medicine, the doctrine of *respondeat superior* could not be applied[.]" *Id.* at 149. However, referring to the persuasive jurisprudence of our sister states, the supreme court observed that "courts no longer allow hospitals to use their inability to practice medicine as a shield to protect themselves from liability."

*Id*. As such, the court officially adopted the Restatement (Second) of Torts section 429 as Indiana's test to determine apparent agency in the hospital setting:

> [A] trier of fact must focus on the reasonableness of the patient's belief that the hospital or its employees were rendering health care. This ultimate determination is made by considering the totality of the circumstances, including the actions or inactions of the hospital, as well as any special knowledge the patient may have about the hospital's arrangements with its physicians. We conclude that a hospital will be deemed to have held itself out as the provider of care unless it gives notice to the patient that it is not the provider of care and that the care is provided by a physician who is an independent contractor and not subject to the control and supervision of the hospital. A hospital generally will be able to avoid liability by providing meaningful written notice to the patient, acknowledged at the time of admission.

*Id*. at 152. Applying the test, the supreme court focused on the lack of evidence in the record indicating that Sword was placed on notice that the anesthesiologist was an independent contractor and the fact that Sword did not know who would administer the epidural until just before the procedure. *Id*. The *Sword* court noted counsel's reference to a document titled "Condition of Admission and Authorization for Treatment," which counsel asserted informed Sword that her physician was not liable for any acts of the practicing physician. *Id*. at 152 n.16. The document was not in the record, but our supreme court observed that, assuming the references were correct, it was far from clear that this document would constitute sufficient notice of the relationship between the hospital and the physician. *Id*. "In fact, it was likely insufficient notice if it is

the sole source of notice and if the plaintiff did not read or sign that form until she arrived at the hospital in active labor." *Id*. Based on the totality of these facts, the court concluded that genuine material issues of fact were in dispute as to whether the anesthesiologist was an apparent or ostensible agent of the hospital. *Id*.

[23] More recently this court applied the *Sword* doctrine in *Helms v. Rudicel*, 986 N.E.2d 302 (Ind. Ct. App. 2013). There, on multiple occasions, the patient signed forms that said "many" of the physicians and other health care providers were independent contractors. *Id*. at 311. The *Helms* court concluded that the notice "referred only to 'many' of the health care providers at the clinic, leaving the patient to guess as to which ones are and which ones are not hospital employees." *Id*. "In light of the *Sword* requirement that the hospital tell the patient it is not the provider of care and that the care is provided by a physician who is an independent contractor and not subject to the control and supervision of the hospital, the court held that there was a genuine issue regarding whether the consent form provided meaningful notice." *Id*. at 313-14. *See also Ford v. Jawaid*, 52 N.E.3d 874, 881 (Ind. Ct. App. 2016) (the patient registration form, which provided, that "I acknowledge that the health care professionals who attend to me, including but not limited to anesthesiologists, radiologists, pathologists, emergency room physicians, and provide and perform such medical and surgical care, tests, procedures, drugs and other services and supplies may be independent contractors and not employees or agents of Floyd

Memorial Hospital and Health Services" presented genuine issues of material fact whether the notice was meaningful).

[24] In satisfaction of its meaningful notice requirement, IU Health points to Dr. Miller's business card provided to Jernagan by Mosby at check-in. Mosby affirmed that she merely handed the business card to Jernagan without any further explanation as to Dr. Miller's employment status. IU Health contends that the business card sufficiently identified Dr. Miller as the anesthesiologist performing the procedure, and "Anesthesia Consultants of Indianapolis" as Dr. Miller's employer. (Appellee's App. Vol. II, p. 42). Claiming that "it is common knowledge that a person's place of employment is identified on their business card, along with the business logo," IU Health encourages us to give Jernagan "more credit" that he realized at check-in that Dr. Miller was not an employee of IU Health. (Appellee's Br. p. 22). However, we cannot conclude that a sole business card, handed without more to an undoubtedly already anxious surgical patient at check-in, conclusively affirms that Dr. Miller was not an employee of IU Health or that the practice group is his employer. The record reflects that Dr. Miller himself rejected the label of employee, and pointed out that he was a partner in the practice group. As such, the business card merely indicates an affinity relationship but does not more closely specify or define that relationship.

[25] Similarly, IU Health's "Consent for Procedure form" recites that the patient "understands and agrees that: [] Medical staff other than the Treating Practitioner may be part of my procedure. [] The Anesthesiologist or Treating

Practitioner may be part of my procedure." (Appellant's App. Vol. II, p. 180). Nowhere does the form characterize Dr. Miller as an independent contractor, let alone indicate a possibility that Dr. Miller may not be an employee of IU Health.

[26] Consistent with the nature of modern-day hospital facilities and the holding of *Sword* and its progeny, we conclude that there is a genuine issue of material fact whether the business card can be considered as meaningful written notice to Jernagan, acknowledged at the time of admission, that Dr. Miller was an independent contractor.[1]

### III. *Vicarious Liability*

[27] Because Jernagan did not include Dr. Miller in his proposed Complaint brought before the medical review panel, IU Health now contends that Jernagan is using the vicarious liability process to "cure a failure to properly name Dr. Miller as a defendant in the first place." (Appellee's Br. p. 32).

[28] The Medical Malpractice Act awards protections to health care providers and an opportunity to defend their care before a medical review panel prior to being subjected to any possible legal determination of malpractice and liability for damages in state court. *See* I.C. § 34-10-1. It is a direct legal responsibility,

---

[1] In so far as IU Health claims that we should consider Jernagan's family contacting Dr. Miller by email and Dr. Miller's response as an acknowledgment that Jernagan was aware of Dr. Miller's independent contractor status, we note that the apparent authority doctrine is based on manifestations by the principal, *i.e.,* IU Health, and not the agent. *Helms*, 986 N.E.2d at 310.

placing the liability on the medical professional. On the other hand, "[v]icarious liability is indirect legal responsibility." *Sword*, 714 N.E.2d at 147. Pursuant to this legal fiction, a party can be held legally responsible for the negligence of another because of the party's relationship to the wrongdoer. *Id*. Our supreme court in *Sword* expressly adopted the formulation of apparent or ostensible agency, as one form of vicarious liability, set forth in the Restatement (Second) of Torts Section 429. *Id*. at 152. The court held that, under Section 429,

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

*Id*. at 149. Therefore, given the *Sword* analysis, vicarious liability claims do not fall within the purview of the medical review panel or the Medical Malpractice Act. *See also Helms*, 986 N.E.2d at 305 n.1 (addressing a vicarious liability claim by way of a motion for preliminary determination); *Columbus Regional Hosp. v. Amburgey*, 976 N.E.2d 709 (Ind. Ct. App.2012) (discussing a vicarious liability claim against a hospital after the statute of limitations had run against the physicians), *trans. denied*. Accordingly, as the medical review panel's procedure is a legal construction solely used in medical malpractice claims, we conclude that Jernagan did not need to file a proposed Complaint with respect to Dr. Miller to the medical review panel prior to commencing a vicarious liability

claim against IU Health. As there is a genuine issue of material fact whether IU Health can be held vicariously liable pursuant to the *Sword* doctrine, we reverse the trial court's grant of summary judgment to IU Health on this issue.

### IV. *Nurses' Liability*

[29] In its summary judgment, the trial court concluded that due to Jernagan's lack of expert witness testimony to contradict the medical review panel on the care of the nursing staff, IU Health was entitled to judgment on those claims. Although Jernagan did not contest the trial court's conclusion in his appellate brief, he raised the issue in his reply brief after the claim was mentioned by IU Health in its appellate brief, alleging that Jernagan had waived the issue of the nurses' liability by failing to raise it on appeal. The law is well-settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief—as was the case here—they are waived.[2] *Monroe Guar. Ins. Corp. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005).

---

[2] Although we waive Jernagan's claim with respect to nursing care, we note that his claim never took centerstage in these proceedings, and was, at times, wholly ignored. In his response to IU Health's motion for summary judgment, Jernagan only advanced some vague and conclusory statements, while at the hearing, Jernagan raised no argument that created a genuine issue of material fact with regard to the nursing care. In his subsequent motion to correct error following the summary judgment, Jernagan raised no challenge based on this issue and during the hearing on his motion to correct error, Jernagan stated that he "didn't think it was an issue in the summary judgment." (Tr. p. 47).

# CONCLUSION

Based on the foregoing, we conclude that a genuine issue of material fact exists whether the delivery of a business card during the surgical registration procedure is sufficient to satisfy the meaningful notice requirement informing the patient that the doctor performing the medical procedure is an independent contractor. On Cross-Appeal, we conclude that Jernagan's response to IU Health's motion for summary judgment was timely.

Reversed.

May, J. and Altice, J. concur